GREENVILLE WOMEN'S CLINIC, Charleston Women's Medical Clinic, Inc., and William Lynn, M.D., on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

Douglas E. BRYANT, in his official capacity as Commissioner of South Carolina Department of Health and Environmental Control, the Governor of the State of South Carolina, in his official capacity, and Charles M. Condon, in his official capacity as Attorney General of the State of South Carolina, Defendants.

No. CIV A 6:96–1898–21.

United States District Court,
D. South Carolina,
Greenville Division.

Feb. 5, 1999.

**694**

Janet Crepps, Diane Curtis, Bonnie Scott Jones, New York City, Lisa Landau, Catherine Weiss, American Civil Liberties Union Reproductive Project, New York City, Randall Scott Hiller, Greenville, SC, Carl A. Brumme, III, ACLU of SC, Columbia, SC, Bebe J. Anderson, New York City, for Plaintiffs.

Charles Molony Condon, Atty. General of South Carolina, Floyd Matlock Elliott, George Dewey Oxner, Jr., Greenville, SC, Treva G. Ashworth, Columbia, SC, Nancy S. Layman, DHEC Office of General Counsel, Columbia, SC, Donald Valentine Richardson, Richardson, Plowden, Carpenter & Robinson, PA, Columbia, SC, James Emory Smith, Jr., SC Atty. General's Office, Columbia, SC, Boyd Nicholson, Jr., Hamilton E. Russell, III, Haynesworth, Marion, McKay & Guerard, Greenville, SC, for Defendants.

## ORDER

TRAXLER, Circuit Judge.

This matter is before the court pursuant to a lawsuit filed by a physician and two medical clinics which offer first trimester abortion services in South Carolina, challenging the constitutionality of a state regulation, S.C.Code Ann. Regs. 61–12, which governs the licensure and operation of physicians' offices and abortion clinics that perform five or more first trimester abortions per month. Plaintiffs seek a declaration that the regulation is unconstitutional and injunctive relief against state officials who would enforce it.

On July 19, 1996, this court issued an order granting plaintiffs' motion for a temporary restraining order and enjoining defendants from enforcing the challenged regulation, pending a hearing on the issuance of a preliminary injunction. Prior to such hearing, however, the parties notified the court that they had agreed to continue the injunction until a decision could be rendered on the merits. A six day non-jury trial was held before this court beginning July 13, 1998, and arguments were heard on October 9, 1998.

## INTRODUCTION

In 1973, the Supreme Court of the United States ruled that a woman's decision to have an abortion was a fundamental right protected by the Constitution. Because the South Carolina Department of Health and Environmental Control, ("DHEC"), has promulgated a regulation governing abortions and abortion clinics, and because there is a legal challenge to its requirements, it has become the responsibility of this court to examine the regulation to determine if it can withstand a challenge to its constitutionality.

An analysis of this issue begins not only with an understanding that a woman's right to choose to undergo an abortion is a constitutionally protected one, but also with a recognition that a state has a legitimate interest in regulating abortions in order to protect maternal health and to promote fetal life. A state has a duty to protect its citizens and this court will uphold such efforts so long as a state's laws do not tread improperly upon rights

protected by the United States Constitution.

In this case, DHEC has promulgated a regulation in the area of abortions which it clearly had the right to do. What it did wrong was to go too far. Despite the fact that abortion clinics have been operated in a safe manner for the past twenty-three years, DHEC loaded these abortion clinics down with so many unnecessary requirements that the court has no choice but to conclude that the regulation unduly burdens a woman's fundamental right to undergo an abortion and, therefore, violates the Due Process Clause of the Fourteenth Amendment to the Constitution.

The regulation also violates the Equal Protection Clause of the Fourteenth Amendment. Simply put, this regulation would impose severe requirements on physicians and clinics performing five or more abortions per month, but not on physicians and clinics performing four abortions per month and/or other, virtually identical, procedures. At trial, there was no logical reason offered as to why these two groups should be treated so differently.

As a result of the many problems with the regulation, this court is constrained to find that it is facially unconstitutional under the Fourteenth Amendment. This court has tried to sever the objectionable portions from the regulation, but the problems are so many and so diffuse that their omission would render the regulation unworkable. Consequently, this court has no alternative but to declare the regulation as a whole invalid and unenforceable.

**FINDINGS OF FACT**[1]

## A. The Parties

1.  Plaintiff Greenville Women's Clinic ("GWC"), located in Greenville, South Carolina, is a women's health care clinic providing gynecological health services, including abortions through 14 weeks of pregnancy measured from the pregnant woman's last menstrual period ("lmp").[2] Dr. Terry Buffkin and Dr. Thomas Campbell own and operate GWC, which has been in operation since 1978. Both are physicians licensed to practice medicine in South Carolina and are board certified in obstetrics and gynecology. On average, GWC performs approximately 2,746 first trimester abortions per year.

2.  Plaintiff Charleston Women's Medical Clinic, Inc. ("CWMC"), located in Charleston, South Carolina, is also a women's health care clinic providing gynecological health services, including abortions through 12.5 weeks of pregnancy lmp. CWMC has been in operation for approximately 25 years. Ms. Lorraine Maguire, a licensed practical nurse, is the administrator of CWMC, and Dr. Richard Manning is its medical director. Dr. Manning is licensed to practice medicine in South Carolina and is board certified in obstetrics and gynecology. The CWMC, on average, performs approximately 2,408 first trimester abortions per year.

3.  Plaintiff William Lynn, M.D. is a physician licensed to practice medi-

---

1.  Pursuant to Fed.R.Civ.P. 52(a), the court sets forth separate findings of fact and conclusions of law. This case involves so much detail, however, that occasionally a full presentation of the issues blurs the distinction between findings of fact and conclusions of law. Accordingly, the court notes that to the extent any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they too are adopted as such.

2.  During the course of trial, pregnancy was measured either from the date of the woman's last menstrual period or from conception, which is generally considered to occur two weeks after the woman's last menstrual period. Accordingly, 14 weeks lmp is equivalent to 12 weeks from the date of conception. *See e.g.*, S.C.Code Regs. 61–12, Section 101(S)(1) and (4).

cine in South Carolina and is board certified in obstetrics and gynecology. Dr. Lynn owns and operates two medical practices—an office in Beaufort, South Carolina ("Dr. Lynn's Beaufort office") and an office in Greenville, South Carolina that does business as the Palmetto State Medical Center ("PSMC"). Dr. Lynn has been regularly performing abortions since 1980. As part of his practice, Dr. Lynn provides abortions up to 13.9 weeks lmp. On average, Dr. Lynn performs 407 first trimester abortions per year in Beaufort and 536 first trimester abortions per year in Greenville.

4. Defendants are Douglas E. Bryant, in his official capacity as Commissioner of the South Carolina Department of Health and Environmental Control ("DHEC"), the Governor of the State of South Carolina, in his official capacity, and Charles M. Condon, in his official capacity as Attorney General of the State of South Carolina.

### B. The Challenged Regulation

5. Prior to 1995, the State of South Carolina only required licensing of physicians' offices or other facilities in which second trimester abortions were performed. *See* S.C.Code Ann. §§ 44–41–20(b) and 70(b) (Law Co-op 1985). On January 3, 1995, however, the South Carolina legislature amended Chapter 41 of Title 44 as follows:

(A) A facility in which *any second trimester or five or more first trimester abortions* are performed in a month must be licensed by [DHEC] to operate as an abortion clinic and must comply with the provisions of Article 3 [the Woman's Right to Know Act].

(B) The department shall promulgate regulations concerning sanitation, housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reports, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, and information on and access to patient follow-up care necessary to carry out the purposes of this section.

S.C.Code Ann. § 44–41–75 (Law Co-op Supp.1997) (emphasis added). The legislation is not challenged in this action.

6. Pursuant to this legislative directive, and procedures governing the promulgation of state regulations (the South Carolina Administrative Procedures Act ("APA"), S.C.Code Ann. § 1–23–10 *et. seq.* (Law. Co-op.1986 and Supp.1997)), DHEC officials drafted the challenged regulation, entitled "Standards for Licensing Abortion Clinics," S.C.Code Regs. 61–12. The regulation consists of approximately twenty-seven pages of detailed requirements that an abortion clinic must comply with in order to obtain and maintain a license to perform abortions, which is to be issued annually by DHEC. An abortion clinic is defined as "[a]ny facility, other than a hospital as defined in Section 101.J, in which any second trimester or five or more first trimester abortions per month are performed." S.C.Code Regs. 61–12, Section 101.B.[3] Thus, it includes all abortion clinics, regardless of their ownership, as well as privately owned and operated physicians' offices. The regulation is divided into ten "Parts," as follows:

Part I Definitions and Requirements for Licensure;

---

**3.** A "Hospital" is defined as "[a]n institution licensed for hospital operation by the Department in accordance with the provisions of Article 3, Chapter 7, Title 44, of the S.C.Code of Laws, 1976, as amended, and that has also been certified by the Department to be a suitable facility for the performance of abortion." S.C.Code Regs. 61–12, Section 101.J.

Part II  Administration and Management;

Part III  Patient Care;

Part IV  Medical Records and Reports;

Part V  Functional Safety and Maintenance;

Part VI  Infection Control and Sanitation;

Part VII  Fire Protection and Prevention;

Part VIII  Design and Construction;

Part IX  Prerequisites for Initial Licensure; and

Part X  General.

With the exception of Parts IX and X, each Part is in turn divided into several sections which impose detailed requirements for the clinic's physical plant, staffing, and provision of medical care. There is no severability clause contained within the regulation.

7.  Currently, South Carolina does not require licensing of physicians' offices outside of the abortion context. Furthermore, physicians licensed to practice medicine in the state are not subject to DHEC regulation, but rather are governed by the South Carolina State Board of Medical Examiners. *See* S.C.Code Ann. § 40–47–5 *et. seq.* (Law Co-op.1986 and Supp.1997). The State Board of Medical Examiners handles the examination and licensure of physicians within the state, complaints against physicians, the suspension and revocation of licenses when appropriate, and the imposition of civil penalties and other sanctions against physicians. With the exception of standard building codes imposed by their particular locales, physicians' offices are not subject to any mandated design and construction requirements. Thus, physicians who limit their abortion practice to less than five first trimester abortions per month are exempt from the requirements of Regulation 61–12. *See* S.C.Code Ann. § 44–41–75(A); S.C.Code Regs. 61–12, Section 101.B. In addition, physicians who perform surgical procedures in their offices which are comparable in terms of risks and duration to first trimester abortions are not subject to the stringent requirements which Regulation 61–12 imposes upon those physicians who regularly perform abortions in their offices.

8.  Plaintiffs contend that Regulation 61–12 violates the substantive due process rights of women seeking abortions in South Carolina because it was not designed to and does not further the state's interest in maternal health, and because the costly provisions will place an undue burden upon a woman's fundamental right to obtain an abortion.[4] Plaintiffs also contend that Regulation 61–12 violates the Equal Protection Clause because it imposes burdensome and costly requirements upon licensed physicians who regularly perform first trimester abortions which are not imposed upon licensed physicians who perform either identical procedures in lesser numbers or comparable surgical procedures regardless of the frequency. In addition, plaintiffs contend that certain sections of the regulation are unconstitutionally vague, violate the confidentiality rights of patients undergoing the abortion procedure, and violate the Establishment Clause con-

---

4.  Although defendants asserted lack of standing as a defense in their answer, they have not pursued the defense during this litigation. Because Regulation 61–12 applies to first trimester abortion providers, the plaintiffs have standing to challenge the constitutionality of the regulation. *See e.g., Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Friendship Med. Ctr., Ltd. v. Chicago Bd. of Health,* 505 F.2d 1141, 1145–48 (7th Cir.1974).

tained within the First Amendment.

## C. Specific Requirements of the Challenged Regulation

9. Plaintiffs contend that the regulation as a whole is medically unnecessary and unduly burdensome to the providers of first trimester abortions in South Carolina and their patients. In addition, plaintiffs have raised individual challenges to specific sections of the regulation. The comprehensive nature of Regulation 61–12 renders a summary of its provisions a daunting task. What follows is a summary by categories created by the regulation, placing special attention on those portions upon which plaintiffs have focused this challenge.

10. Part I of the regulation sets forth general "Requirements for Licensure" of abortion clinics. In order to operate, the facility must undergo a pre-licensure inspection. Once the initial license is obtained, the facility must be inspected annually in order to obtain renewal of the license. In addition, the regulation provides that the facility may be subjected to unannounced DHEC inspections at any time, during which DHEC "inspectors shall have access to all properties and areas, objects, records and reports, and shall have the authority to make photocopies of those documents required in the course of inspections or investigations." S.C.Code Regs. 61–12, Section 102.F.2. There is no requirement in the regulation that DHEC or its inspectors maintain the confidentiality of any records, including the patient's personal medical records, although DHEC has included such confidentiality directives in regulations governing other types of health care facilities. *See e.g.,* S.C.Code Ann. Regs. 61–91, Section 1001–D (mandating that DHEC "safeguard[ ] information in the medical records [of patients in ambulatory surgical centers] against ... use by unauthorized persons").

11. Upon a determination by DHEC that a facility is in violation of "any statutory provision, rule or regulation relating to the operation or maintenance of such facility,"DHEC may deny, suspend or revoke the license. S.C.Code Regs. 61–12, Section 103. In addition, DHEC may assess a monetary penalty for each violation up to $5000. The amount of the penalty is based upon the specific provision at issue, which has been preassigned a designation as either a Class I, II, or III violation. In addition to the detailed requirements already set forth in the regulation, the regulation also authorizes imposition of a Class III penalty for any practice deemed to be "against the best practices as interpreted by the Department," S.C.Code Regs. 61–12, Section 103.C., without further guidance or definition.

12. Part II of the regulation governs "Administration and Management" of the clinic. Section 201 requires the facility to develop and implement detailed written policies and procedures for operation of the facility, which must include at a minimum policies and procedures to ensure compliance with all federal, state, and local laws which govern the facility; designation of a responsible person and the establishment of methods for holding the person responsible; personnel policies and procedures, including in-service training requirements; a facility-wide quality improvement program, including statistical summaries, and a written plan of implementation; a policy and procedure

for patient rights and grievance procedures; functional safety and maintenance policies and procedures; a policy and procedure for incident reporting; and policies and procedures for obtaining informed consent from the patient.[5] In addition, the facility's policies and procedures must include a provision for annual review and evaluation of the facility's other policies and procedures, as well as for its management and operation. No specific guidance is provided as to what these policies and procedures must contain.

13. Section 203 requires the facility to maintain on file all current policies and procedures concerning operation of the facility, memoranda of agreements and credentialing documentation, a copy of the regulation, annual elevator safety inspections and an annual heating, ventilation, and air conditioning inspection report.

14. Section 204 sets forth detailed personnel requirements. The facility must obtain and verify professional and personal background information on every employee and must develop and implement a written orientation program for new staff members, to include orientation on the other policies and procedures. A formal, written, inservice training program must also be planned and provided for all employees and volunteers, and records kept of attendance. The inservice training of all employees and volunteers must include four specified areas—infection control, fire protection, confidentiality and patient rights, and licensing regulations. Written job descriptions must be prepared and reviewed annually, and a personnel file containing various mandated information must be kept on all employees. Annually, each employee must have a tuberculin skin test or, if previously positive, a chest x-ray to determine whether tuberculosis is present. If tuberculosis is diagnosed, the facility must provide treatment and investigate employee contacts. Employees and volunteers are also banned from working if they have any infected wounds, boils, sores, acute respiratory infections, or any other contagious disease or illness. According to the medical evidence in this case, this would include such ordinary illnesses as a common cold. In addition, all professional and allied health professional staff members must be certified by the American Red Cross or American Heart Association as capable of performing CPR, although only one such certified person must be with patients when they undergo the abortion procedure and during the recovery period.

15. Section 205 sets forth requirements for the clinical staff, which encompasses all physicians, nurses, and allied health professionals. Abortions may only be performed by physicians licensed to practice medicine in South Carolina who are also "properly qualified by training and experience to perform pregnancy termination procedures." S.C.Code Regs. 61–12, Section 205.-C.1. The regulation, however, provides no guidance on the additional credentials required beyond that of a medical license to meet this qualification standard. The facility must also obtain and maintain signed, written agreements with at least one physician board certified in obstetrics and gynecology who has admitting privileges at a local hospital which provides obstetrical

5. Informed consent for an abortion is already required by state law. See S.C.Code Ann. § 44–41–30 and § 44–41–310 et seq. (Law Co-op Supp.1997).

and gynecological services. All nursing care is required to be under the supervision of a registered nurse licensed in the State of South Carolina, regardless of the presence of a physician in the facility, and the registered nurse must be "on duty to provide or supervise all nursing care" during preparation, the procedure, recovery, and discharge. S.C.Code Regs. 61–12, Section 205.D.2. Licensed practical nurses may be employed so long as they work under the supervision and direction of a registered nurse. Ultrasounds may only be conducted by physicians or ultrasound technicians who have documented evidence of completion of a training course in ultrasonography. Finally, the entire clinical staff must participate in quarterly meetings to review and analyze clinical experiences, and minutes must be kept and maintained of each meeting.

16. Sections 206 through 208 of the regulation require the facility to comply with state statutory sections pertaining to the dissemination of information to women seeking abortions and to obtaining consent to perform the procedure, each of which already contains penalty provisions for the failure to comply. Thus, these portions of the regulation do nothing more that impose a second layer of penalties (indeed, the most severe Class I penalties) for the conduct already punishable under the statutory sections incorporated within the regulation.

17. Section 209 of the regulation requires the facility to "have written policies and procedures to assure the individual patient the right to dignity, privacy, safety, and to register complaints with [DHEC]." S.C.Code Regs. 61–12, Section 209. A copy of the patient rights must be conspicuously displayed, and a copy must be signed by each patient and included in the patient's medical record. However, no guidance is provided as to what specific information must be included in these documents.

18. Part III of the regulation sets forth requirements for "Patient Care." Additional "patient care policies and procedures designed to ensure professional and safe care for patients" must be developed, S.C.Code Regs. 61–12, Section 301, and must include, but are not limited to, policies and procedures for admission criteria; physician and nurse responsibilities; details regarding the pre-operative procedures (including history and physical, special examinations, lab procedures and consultations which will be required, and ultrasonography procedures); details regarding the actual abortion procedure (including the use of IV's, fluids, analgesia, anesthesia, and tissue examination and disposal); details regarding post-procedure care and recovery room care, including emergency care; "[p]rovisions for education of the patient, family and others, as appropriate in pre and post-procedure care," S.C.Code Regs. 61–12, Section 301.F.; plans for follow-up care, including arrangements for a postoperative visit and specific instructions in the event of an emergency; procedures for the management and referral of high-risk conditions; procedures for the transfer of patients when needed; procedures for infection control and sanitation (including duties and responsibilities of an infection control committee which are, in turn, charged with the responsibility of developing and implementing specific patient care and administrative policies to investigate, control and prevent in-

fections in the facility); and procedures for the registration of fetal death or death certificates.

19. Section 303 of the regulation imposes detailed requirements concerning emergency drugs which must be kept on the premises, and specifies seven medical conditions for which drugs and equipment must be available. In addition, the regulation mandates the presence of a refrigerator with "[a] thermometer accurate to +/3 degrees Fahrenheit." S.C.Code Regs. 61–12, Section 303.C. A specific method of preparing medications for administration is mandated, including a requirement that a sink and counter be in the area.

20. Section 304 requires laboratory services to be performed in compliance with the requirements already mandated by the Clinical Laboratory Improvement Amendments of 1988, ("CLIA"), 42 U.S.C.A. § 263a (West 1991).[6] It further requires the physician to perform a urine pregnancy test (unless fetal heart beats or movements are identified on physical examination), a urinalysis which includes albumin and glucose examination, and a hematocrit or hemoglobin test. In addition, the physician must perform a test to determine Rh factor. If the patient is Rh positive, an additional Du variant test is required. Rh (D) immune globulin must be administered if the patient is determined to be Rh negative. Testing for chlamydia and gonorrhea is mandatory, but testing for syphilis serology and performance of a Papanicolaou (pap) smear must only be offered to the patient.

21. Section 305 provides additional requirements for emergency care. It requires that "[a]ll staff and/or con-sulting physicians" have admitting privileges at one or more local hospitals that provide appropriate obstetrical/gynecological services or have in place documented arrangements approved by DHEC for the transfer of emergency cases when hospitalization becomes necessary. S.C.Code Regs. 61–12, Section 305.A. The facility must maintain equipment and services to render emergency resuscitative and life-support procedures pending transfer. And the facility must notify, in writing, the local ambulance service of the location of the facility and the nature of the medical problems which may result from abortions.

22. Section 306 mandates that the facility purchase and maintain specific equipment and supplies, including such items as "[a] bed or recliner suitable for recovery," oxygen, mechanical suction, resuscitative equipment, emergency medications, intravenous fluids, "[a] clock with a sweep second hand," sterile suturing equipment and supplies, an adjustable examination light, and soiled linen and waste containers. S.C.Code Regs. 61–12, Section 306.

23. Section 307 mandates that the facility have "[a]rrangements ... for consultation or referral services in the specialties of obstetrics/gynecology, anesthesiology, surgery, psychiatry, psychology, clinical pathology and pathology, clergy, and social services, as well as any other indicated field, to be available as needed." S.C.Code Regs. 61–12, Section 307. The regulation does not specify whether the "arrangements" must be in writing, nor does it specify the number of clergymen or types of religious coun-

---

**6.** The court notes, however, that CLIA–88 has been subsequently amended, *see* 42 U.S.C. § 263a (West Supp.1998).

seling which must be made available.

24. Section 308, entitled "Quality Improvement," again mandates a written plan for a quality improvement program for patient care and designation of an individual responsible for coordinating the program. Specific requirements include ongoing monitoring and evaluation of "patient care services, staffing, infection prevention and control, housekeeping, sanitation, safety, maintenance of physical plant and equipment, patient care statistics, and discharge planning services." S.C.Code Regs. 61–12, Section 308.B. Evaluation of patient care is required to be "criteria-based, so that certain actions are taken or triggered when specific quantified, predetermined levels of outcomes or potential problems are identified," S.C.Code Regs. 61–12, Section 308.B, but the regulation does not specify what criteria are acceptable or required. The process must incorporate a quarterly review of a minimum of five percent of the medical records per quarter, and must include a means of obtaining input from families of patients if they are "involved in the care and services provided by the facility." S.C.Code Regs. 61–12, Section 308.E. The facility administrator must review the findings of the program and ensure corrective actions are taken. The program must also identify and establish indicators of quality care, specific to the facility, that must be monitored and evaluated. Annual review of the results is also required.

25. Part IV of the regulation sets forth requirements for "Medical Records and Reports." Section 401 begins by setting forth detailed requirements for the preparation and maintenance of medical records, which must include, at a minimum, twenty categories of information.

Of particular concern to the plaintiffs in this case, the section requires a face sheet with patient identification data, including the name of the patient's husband in addition to the name, address and telephone number of a person to be notified in the event of an emergency. The records are required to be kept confidential by the facility (although no such requirement is imposed upon DHEC inspectors who obtain them) and must be stored for a minimum of 10 years. Section 403 requires the preparation of additional reports, including a record of every accident or incident occurring in the facility which involves patients, staff, or visitors. If it results in serious injury, the accident or incident must be self-reported to DHEC. Serious injuries "include, but are not limited to," accidents and incidents that lead to hospitalization or death (other than of a fetus) and adverse drug reactions. S.C.Code Regs. 61–12, Section 403.B.

26. Part V of the regulation, entitled "Functional Safety and Maintenance" requires additional policies and procedures, including, but not limited to, safety rules and practices for personnel, equipment, gases, liquids, drugs, supplies, and services; provisions for investigating accidents on the premises; provisions for disseminating safety-related information to employees and users of the facility; provisions for syringe and needle handling and storage; and provisions for managing infections waste in accordance with another DHEC regulation already governing such matters. In addition, the facility must prepare and post a disaster preparedness plan for evacuation in the event of a fire or other emergency. All parts and portions of the facility are generically re-

quired to be kept "in good repair and operating condition," and "free of hazards." S.C.Code Regs. 61-12, Section 503.A. In addition, the section requires that "[a]ll wooden surfaces shall be sealed with a non-lead based paint, lacquer, varnish, or shellac that will allow sanitization." *Id.* A written preventive maintenance program must be developed and implemented for patient monitoring equipment and tested in accordance with manufacturer's specifications, but not less than annually. Records of maintenance and testing must be kept.

27. Part VI of the regulation is entitled "Infection Control and Sanitation." It sets forth specific requirements for sterilization, including daily testing of the autoclave and a log of results, as well as periodic calibration and preventative maintenance as necessary, but not less than annually. The regulation contains provisions mandating "adequate" linens and "proper laundering," and provides that "[a] sufficient supply of cloth or disposable towels shall be available so that a fresh towel can be used after each handwashing." S.C.Code Regs. 61-12, Section 603. It specifically prohibits towel-sharing. The regulation also generically requires that the facility "be kept neat, clean, and free from odors," mandates specific requirements for cleaning methods to be used and prohibits others, and imposes requirements for refuse and waste disposal. S.C.Code Regs. 61-12, Sections 604 & 605. Section 606 requires that "[a]ll outside areas, grounds and/or adjacent buildings shall be kept free of rubbish, grass, and weeds that may serve as a fire hazard or as a haven for insects, rodents and other pests," and that all "[o]utside stairs, walkways, ramps and porches shall be maintained free from accumulations of water, ice, snow, and other impediments." S.C.Code Regs. 61-12, Section 606.

28. Part VII of the regulation, entitled "Fire Protection and Prevention," provides detailed requirements for fire-fighting equipment and systems, an evacuation plan, training of employees in the evacuation plan, mandatory fire drills at least once every three months, maintenance of fire equipment, and maintenance of records proving compliance with the provisions.

29. Part VIII of the regulation sets forth detailed requirements for the "Design and Construction" of abortion facilities. There is no grandfathering provision (unlike other DHEC regulations governing medical and patient care facilities)—rather all facilities must be in full compliance within two years. The requirements are set forth in overwhelming detail, rendering a summary of them impossible. By way of example, however, the regulation governs the number and size of procedure and recovery rooms, specifies the design and equipment required in toilet rooms, regulates the direction of the "[a]ir flow" within the sterilization rooms, S.C.Code Regs. 61-12, Section 807.-F., mandates a minimum width for doors and corridors, sets forth specific requirements for heating and air conditioning (the unit must be capable of maintaining a temperature between 72 and 76 degrees), regulates the facility's air supply and exhaust, regulates design criteria for clinic entrances, sets forth specific requirements for the "janitor's closets," S.C.Code Regs. 61-12, Section 807.O., and specifies the corridor glazing materials, wall finishes, wall bases, and interior finish materials that must be present. The regulation also regulates water

supply and plumbing within the facilities.

30. Part IX of the regulation sets forth additional "Prerequisites for Initial Licensure" of the facility, including plan and construction approval by DHEC, and specifies the documentation required to be submitted with the facility's initial application for licensure.

31. Finally, Part X of the regulation, entitled "General" states in its entirety that "[c]onditions arising that have not been addressed in these regulations shall be managed in accordance with the best practices as interpreted by the Department." S.C.Code Regs. 61–12, Part X. As noted previously, a violation of such an unspecified requirement is considered a Class III violation of the regulation.

32. At the trial of the case, defendants sought to enter several "stipulations" concerning their intended interpretation of certain requirements of the regulation. First, as to Section 102.F.2., which grants DHEC inspectors the right to copy medical records without a confidentiality provision, defendants assert that DHEC "policy" would protect the confidentiality of these records, as would the provisions of S.C.Code Ann. §§ 44–7–310 and 315 (Law Co-op. Supp.1997). Second, as to Section 307 which requires the facility to make "[a]rrangements" with various specialties, defendants contend that the section does not require written "agreements" with such specialties, but only that the physician attempt to assist the patient in obtaining a referral when such services are indicated and/or requested by the patient. Third, as to Section 205(C)(2) which requires the facility to enter into a signed written agreement with at least one physician board certified in obstetrics and gynecology (if one is not on staff) and who has admitting privileges at a local hospital, defendants sought to delete the board-certification requirement. Finally, as to Section 602.C.1 which requires daily autoclave testing, defendants admit this is an error and that it should be weekly testing. Plaintiffs have not joined in these "stipulations." Instead, they contend that defendants' proposals are efforts to rewrite the regulation.

### D. Abortion Services in South Carolina

33. According to the evidence in this case, there are no abortion providers in South Carolina who perform elective abortions (those not associated with medical complications) in the second trimester of pregnancy. All of the plaintiffs in this action limit their services to abortions during the first trimester of pregnancy.

34. Plaintiffs in this case currently use the suction curettage procedure during the first trimester for elective abortions. The procedure is also utilized for spontaneous miscarriages. Although not wholly without risks, it is undisputed that a suction curettage abortion during the first trimester of pregnancy is a relatively safe and quick medical procedure performed between six and fourteen weeks lmp. It involves dilating the cervix, inserting a suction catheter into the uterus, and applying suction to remove the contents of the uterus. Although the patient is usually in the procedure room for a total of ten minutes, the procedure itself only takes approximately two to five minutes. It involves no incision and a minimum of bleeding. After the procedure, patients usually walk to the recovery area, where their pulse and blood pressure are monitored and they are checked for any ab-

normal bleeding. Possible complications from the suction curettage procedure are fainting from vasovagal response, uterine perforation, excessive bleeding, infection, and retained tissue in the uterus. However, while the total complication rate for the procedure is about 1 in 100, serious complications are rare. The rate for complications requiring hospitalization is only about 1 in 2000. And the mortality rate is 1 in 100,000, which is about 25 times less risky than carrying a pregnancy to term. There is no evidence in this case that a first trimester suction curettage abortion has ever resulted in a woman's death in this state.

35. Physicians in South Carolina, including Dr. Buffkin and Dr. Campbell, also perform medical abortions to terminate pregnancies located outside the uterus (such as in the fallopian tube) during the first six to seven weeks of pregnancy. A medical abortion is an even safer procedure than the suction curettage. It involves the performance of a routine blood test to measure the patient's hormone levels, followed by the injection of a drug (methotrexate) into the patient's arm. There is no recovery time after the injection, and only mild vaginal bleeding. Follow-up care consists of rechecking the patient's hormone levels several days after the injection, and rechecks thereafter at seven day intervals. Although currently limited in use to the termination of ectopic pregnancies, methotrexate and a second drug, RU–486, are currently being used in research protocols for use in terminating intrauterine pregnancies.

36. Regulation 61–12 applies to abortion clinics performing five or more first trimester abortions and/or a single second trimester abortion per month. It is undisputed that second trimester abortions are significantly more risky to the health of women than first trimester abortions. Because the plaintiffs in this case only provide abortions during the first trimester of pregnancy, plaintiffs' challenge to the regulation is limited to its application to providers of first trimester abortions in South Carolina. Accordingly, the court will express no opinion as to the constitutionality of Regulation 61–12 as applied to facilities which may seek to perform second trimester abortions in the future.[7]

### E. The Drafting and Promulgation of Regulation 61–12

37. At the trial of this case, several DHEC employees and a DHEC consultant testified concerning the drafting and promulgation of Regulation 61–12. The testimony reveals that the regulation was not tailored to further the state's legitimate interest in preserving and protecting the health of women seeking first trimester abortions and that the drafters took no meaningful steps to ensure that it would serve that purpose. Nor did they attempt, in any meaningful fashion, to determine the financial impact the regulation might have on the provision of first trimester abortion services in the state.

---

**7.** Regulation 61–12 contains an additional section, Section 309 under Part III "Patient Care," which mandates additional qualifications which the performing physician must possess, additional equipment which must be on hand, and additional medical tests which must be administered for second trimester abortions. Defendants have offered an additional "stipulation" regarding its provisions. Although not relevant to the challenge before this court, the section lends some support to the court's finding that second trimester abortions are more risky and raise different concerns than first trimester abortions.

38. First, DHEC officials were not aware of any public health problem associated with facilities providing abortions in South Carolina and did not investigate whether there were any such public health problems prior to drafting the regulation. Indeed, it is undisputed that DHEC promulgated the regulation solely in response to the legislative directive contained within S.C.Code Ann. § 44–41–75.

39. After the legislation requiring licensure of abortion clinics was passed, Mr. Alan Samuels with DHEC was charged with the responsibility for supervising the drafting and promulgation of the regulation. Although Mr. Samuels has some experience in health care administration, he has received no formal medical training or education. Upon completion of his college education, Mr. Samuels served in the United States Army for twenty-four years, where he served with the adjutant general corps and the medical services corps as a personnel officer and hospital inspector. After leaving military service, Mr. Samuels began employment with DHEC, where his duties consisted of inspecting various types of health care facilities for compliance with existing regulations. He was eventually promoted to the position of director of the DHEC Health Licensing Division, and has now retired.

40. Although Mr. Samuels provided some input and edits during the drafting process, he did not personally draft any portions of the regulation. Rather, he delegated the primary drafting responsibility to Mr. George Moore, who was the Director of Outpatient and Home Care within the Division of Health Licensing. Mr. Samuels admitted that he knew very little about abortion procedures or the differences between first trimester and second trimester abortions when the regulation was promulgated. His testimony also reveals that he personally conducted no meaningful study or research into the differences between a first and second trimester abortion, and conducted no meaningful inquiry into what regulatory requirements were appropriate for facilities performing only first trimester abortions.

41. Like Mr. Samuels, Mr. Moore has some education and experience with hospital administration, but has received no formal medical training or education. After receiving an undergraduate degree, Mr. Moore joined the United States Army where he served twenty-five years. He spent the early part of his service in the adjutant general corps performing general administrative duties, after which time he transferred to the medical services corps where he performed administrative duties associated with health care facilities and hospitals. During his service, Mr. Moore received a masters degree in hospital administration. Upon his retirement from military service in 1988, Mr. Moore began employment with DHEC, inspecting hospitals and nursing homes for compliance with existing regulations. He was later promoted to Director of Outpatient and Home Care within the Division of Health Licensing, the position he held when Mr. Samuels asked him to assume primary responsibility for the drafting of the regulation. In preparation for drafting the regulation, however, Mr. Moore also took no meaningful steps to educate himself about first trimester abortions, how they differed from second trimester abortions, or what requirements would be appropriate for a facility which performed only first trimester abortions.

42. For assistance with Parts VII and VIII of the regulation (Fire Protection and Prevention/Design and Construction), Mr. Moore turned to Mr. William Lafferty, who was the Director of Health Facilities Construction with DHEC. Like Mr. Samuels and Mr. Moore, Mr. Lafferty has received no formal medical training or education. He testified that in drafting these portions of the regulations, he made no effort to determine whether the requirements were medically appropriate for facilities performing only first trimester abortions and that this was not his orientation. Mr. Lafferty also testified that he approached the design and construction requirements from the standpoint of new construction requirements and anticipated that existing facilities would be grandfathered. The decision to include a mandatory two-year compliance provision in that portion of the regulation was not made by Mr. Lafferty.

43. According to Mr. Moore, the preexisting South Carolina regulation governing second trimester abortions was utilized as a starting point for the new regulation, and many of the additional provisions of the new regulation were simply adopted or derived from DHEC regulations governing other types of health care facilities. They included regulations governing Ambulatory Surgical Centers, Renal Dialysis Facilities, Community Residential Care Facilities, Day Care Facilities for Adults, Outpatient Facilities for Chemically Dependent Persons, Habitation Centers for the Mentally Retarded, Residential Treatment Facilities for Children and Adolescents, Nursing Homes, and facilities providing home health care and hospice services. According to defendants, DHEC sought to standardize its regulations governing medical facilities and medical care so that the licensing requirements would have consistent wording, and to codify existing departmental practices.

44. According to the DHEC officials, this attempt to standardize its regulations and to codify existing practices included DHEC's desire to grant its inspectors the authority to copy medical records in all medical facilities. Mr. Moore testified that departmental practice currently allows the copying of medical records during a complaint investigation and that DHEC would maintain the confidentiality of the records. However, there is no provision in Regulation 61–12 which would mandate such confidentiality and defendants have pointed to no other state laws or regulations which would, in the court's opinion, adequately protect a patient's confidential medical records. In addition, the court notes that the DHEC regulation governing ambulatory surgical centers contains a specific provision protecting the confidentiality of medical records. See S.C.Code Regs. 61–91, Section 1001.E (providing that records may only be removed from the premises by subpoena or court order).

45. Furthermore, defendants presented no evidence comparing the patient risks presented in other types of facilities regulated by DHEC with those presented in physicians' offices or clinics performing first trimester abortions, with the possible exception of ambulatory surgical centers. However, the medical evidence presented reveals, and there is little dispute, that the risks and potential complications of surgical procedures typically performed in ambulatory surgical centers are significantly higher than those associated with first trimes-

ter abortions.[8] Yet a comparison of the regulations reveals that in many ways Regulation 61–12 imposes requirements more stringent than those imposed upon ambulatory care centers. Furthermore, there is no evidence in the record as to how DHEC formulated the regulations applicable to ambulatory surgical centers, or whether they received substantial assistance from medical professionals during the drafting process. Accordingly, the mere fact that some of the requirements contained within Regulation 61–12 are similar to those contained within the ambulatory surgical center regulation is of little assistance to this court in determining whether they are appropriate requirements to impose upon a physician or clinic performing only first trimester abortions.

46. Although the DHEC officials testified that they primarily utilized existing South Carolina regulations as the basis for the challenged regulation, defendants have pointed to additional sources of information to defend the regulation. First, there is testimony that Mr. Moore obtained copies of abortion regulations from North Carolina and Tennessee. However, Mr. Moore did not speak with anyone in those states about the regulations or how they had affected maternal health and, in any event, the requirements of Regulation 61–12 exceed those contained in the regulations of these neighboring states. There is also testimony that Mr. Moore reviewed standards and guidelines issued by the Planned Parenthood Federation of America, Inc.

("Planned Parenthood"), the National Abortion Federation ("NAF"), and the American College of Obstetricians and Gynecologists ("ACOG"). However, with the exception of Planned Parenthood, which requires its affiliates to comply with its standards unless an exception is granted, the majority of the standards reviewed by Mr. Moore are not mandated standards of medical care. Rather, they are guidelines which must be accommodated to the needs of a particular facility and its patients through the exercise of physician judgment and discretion. Furthermore, a comparison of Regulation 61–12 with the standards and guidelines offered in support of the regulation reveals that DHEC in fact far exceeded even those guidelines.

47. According to witnesses presented by both sides of this controversy, ACOG is a well-respected, nationwide organization of obstetricians and gynecologists which serves to develop and further the standard of care in this specialty. During the drafting process, the general counsel of ACOG wrote a letter to DHEC expressing concern that the requirements of the regulation would not enhance patient well-being or safety and offering DHEC the assistance of ACOG in the drafting of an appropriate regulation. The DHEC drafters declined ACOG's assistance.

48. After an initial draft of Regulation 61–12 was completed, Mr. Moore requested limited input and comments from two medical personnel

---

**8.** Indeed, the regulation itself recognizes this distinction. Under the regulation, licensed abortion clinics are restricted to performing abortions within 18 weeks lmp. Clinics performing abortions beyond 14 weeks lmp must meet the additional patient care requirements in Section 309 of the regulation (which requires additional physician qualifications, medical equipment, and mandatory laboratory tests). Abortions beyond 18 weeks lmp must be performed in a hospital, although a licensed ambulatory surgical center that is also licensed as an abortion clinic may perform abortions on patients up to 26 weeks lmp. *See* S.C.Code Regs. 61–12, Section 302.

associated with DHEC. The first, Richard Goodrich, M.D., is a licensed physician, board certified in obstetrics and gynecology, who practiced in Zanesville, Ohio until he retired. After his retirement, he moved to South Carolina and became a consultant with DHEC in the area of maternal and child health. During his medical practice, however, Dr. Goodrich performed only two abortions, both of which were due to medical complications. Furthermore, Dr. Goodrich was not asked to and did not draft any portion of Regulation 61–12. Rather, he was only asked to review discrete portions of the regulation dealing exclusively with medical events and medical testing, and he conducted no review of and provided no input on the majority of the regulatory requirements. While he is of the opinion that the portions of the regulation that he reviewed are appropriate medical standards of care, he testified that the same standards would be appropriate for physicians' offices in which comparable obstetrical and gynecological surgical procedures are performed. Dr. Goodrich further testified that he did not recommend the regulation's requirement of physician qualifications beyond state licensure, and acknowledged that he did not know how the required "training and experience" qualifications could be determined under the regulation. Dr. Goodrich also interpreted the regulation's requirement that a registered nurse be "on duty" as requiring that a registered nurse have ultimate responsibility, and not that a registered nurse should or needs to be on the premises at all times. Dr. Goodrich further testified that, while he has no specific experience with medical abortions, it would not be his intent to cover the pro-

vision of medical abortions under the regulation. He acknowledged, however, that the regulation as drafted would in fact cover such abortions. Finally, Dr. Goodrich testified that he is aware of no existing problem with abortion providers in South Carolina and has no opinion as to how the cost and availability of abortions affect women's health issues.

49. Mr. Moore also sought some limited input from Robert Lawyer, R.N., who was Director of Nursing for DHEC. Mr. Lawyer received his bachelor of science degree in nursing while in the United States Army, and later received a masters degree in health services management and business administration. He has some experience with providing nursing care for first and second trimester abortions performed in a military hospital. After retiring from the Army in 1989, he began working with DHEC. He is currently nurse manager with the Division of Health Licensing, where his primary duty is the inspection of various health care facilities for compliance with existing regulations. He too was only asked by Mr. Moore and Mr. Samuels to review and provide input concerning discrete portions of the regulation, primarily those governing nursing care. Mr. Lawyer is of the opinion that, for first trimester abortions, a registered nurse should either personally monitor the patient or supervise all patient care, unless the physician is present in the facility and available to come to the recovery room if necessary. Unlike Dr. Goodrich, however, he interprets the regulation as requiring the "on duty" registered nurse to be on the premises. In formulating his opinion, Mr. Lawyer did not conduct any research on abortion practices in South Car-

olina, nor did he consult with nursing professionals who specialize in abortion procedures. Mr. Lawyer testified that while he is aware that the regulation would apply to facilities performing only medical abortions, he has no knowledge of what nursing skills are required in the context of medical abortions or whether they would require a registered nurse as opposed to a licensed practical nurse.

50. With the exception of these limited consultations with medical personnel associated with DHEC, the drafters of Regulation 61–12 did not seek any input from medical professionals during the drafting process and rejected ACOG's offer of assistance. As some support for the text of the regulation, defendants contend that the drafters conducted a "mock inspection" of Planned Parenthood's facility in Columbia, South Carolina and determined that the facility met the great majority of the regulation's requirements. The evidence presented, however, reveals that the drafters simply toured the facility and, during one such visit, may have spoken briefly to a Planned Parenthood physician. There is no evidence that the physician was asked to comment upon the regulatory requirements or whether they were medically indicated for first trimester abortions, nor does the evidence support a finding that DHEC received any meaningful input from Planned Parenthood physicians prior to or during the early stages of the drafting process.[9]

51. After this initial drafting process was concluded, DHEC issued a proposed regulation and held public hearings as mandated by the APA. Some of the suggestions made during this public comment period resulted in changes to the regulation, including some suggestions made by Planned Parenthood and the plaintiffs in this case.

52. On January 23, 1996, DHEC submitted the regulation to the South Carolina Legislature for approval, as required by the APA. Because the legislature took no action on the regulation within 120 days after its submission, it became automatically effective upon publication in the State Register on June 28, 1996.

53. Plaintiffs filed this lawsuit the day before the regulation's publication date. As noted previously, this court enjoined its implementation on July 19, 1996 via a temporary restraining order, which the parties agreed to continue pending a determination on the merits of plaintiffs' claims.

### F. Testimony of Local Providers of Surgical Care

54. At the trial, Dr. Terry Buffkin, Dr. Thomas Campbell, Dr. William Lynn, and Dr. Richard Manning testified concerning the regulation at issue and its probable effect on the health of women and the availability of abortions in South Carolina.

55. Dr. Terry Buffkin is board certified in obstetrics and gynecology, licensed to practice medicine in South Carolina, a fellow in ACOG, a member of numerous state and local medical organizations, and has been granted admitting privileges

9. In addition, DHEC places great reliance upon the fact that Planned Parenthood is not a plaintiff in this action. According to the testimony of a Planned Parenthood representative, Planned Parenthood did not participate in the lawsuit for political reasons, but agrees that the regulation is largely unnecessary and, as a whole, unduly burdensome. The court finds the absence of Planned Parenthood as a plaintiff in this action to be irrelevant to the determination of the issues before it.

at two local hospitals. He and his partner, Dr. Campbell, have been performing first trimester abortions at GWC since 1978.

56. Dr. Buffkin testified that first trimester suction curettage abortions can be safely performed in a physician's office, clinic, ambulatory surgical center or hospital. Ambulatory surgical centers, however, are typically used for more invasive type procedures (such as tubal ligations and laparoscopic procedures), and hospitals would be appropriate only if the patient has other significant medical problems which might complicate the procedure (such as heart disease). Dr. Buffkin also testified that medical abortions can be safely performed for ectopic pregnancies in a physician's office or clinic setting.

57. Dr. Buffkin testified that he is aware of no public health problem with the provision of abortion services in South Carolina and that he is aware of no physicians or others who are providing inadequate health care in regard to first trimester abortions in South Carolina.

58. Dr. Buffkin testified that GWC already complies with some, but not all, of the requirements of Regulation 61–12. For example, Dr. Buffkin testified that they do not perform all of the medical tests mandated by the regulation as a matter of course, but rather perform only those medical tests that are indicated based upon the patient's history, risk factors, and physical examination. He testified that the ACOG guidelines are not, and should not be, mandated standards of medical care, and that they can be varied from without compromising good patient care.

59. Dr. Buffkin testified that the regulation will not improve the health care of women seeking first trimester abortions in the state. He further testified that the regulation will directly increase the cost of abortion services to patients in South Carolina because it mandates the performance of unnecessary and expensive tests. It will also increase costs by imposing detailed administrative, structural, and other requirements which, although perhaps appropriate in an ambulatory surgical center or hospital environment, are not necessary in a small clinic or physician's office where the staff interacts daily. Dr. Buffkin also opined that the detailed requirements carry significant hidden costs in the nature of penalties and legal fees to challenge cited violations in the future. Finally, Dr. Buffkin is of the opinion that the increased cost of abortion services will result in a number of women either delaying the procedure or being unable to obtain the procedure, both of which increase the health risks to the pregnant woman.

60. Dr. Thomas Campbell is also a licensed physician in South Carolina, board certified in obstetrics and gynecology, and has been granted admitting privileges at several local hospitals. He is also of the opinion that Regulation 61–12 will increase the cost and decrease the availability of abortion services in South Carolina. Dr. Campbell testified that the detailed provisions of the regulation are unnecessary and inappropriate for a clinic performing first trimester abortions, and that they will not improve the health of women seeking abortions in South Carolina.

61. Dr. William Lynn is also licensed to practice medicine in South Carolina, is board certified in obstetrics and gynecology, and has been granted admitting privileges at a local hospital. He has been per-

forming first trimester abortions continuously since 1980. Dr. Lynn testified that he is aware of no public health problem associated with the provision of abortions in South Carolina. It is his opinion that the regulation will greatly increase the cost of abortion services in South Carolina, may make it impossible for some physicians to continue to offer abortion services, will not enhance women's health or increase the level of medical care in the community, and will make it more difficult for women to obtain reasonable abortion care in a safe setting. He further opines that the regulation is inappropriate for a first trimester abortion clinic and is instead more suited to a hospital environment. Dr. Lynn testified that the regulation mandates standards of care and costs which are contrary to the current trend of moving medical care away from hospitals and into outpatient facilities and physicians' offices to decrease costs.

62. Dr. Richard Manning is also board certified in obstetrics and gynecology, and is licensed to practice medicine in South Carolina and five other states. He currently serves as medical director of CWMC and performs first trimester abortions on a regular basis. He shares the opinion that the regulation will increase the cost of abortions and will not improve health care, and that the detailed regulations, while possibly appropriate for a large hospital, are unnecessary for a small clinic performing first trimester abortions where people work together and communicate daily.

63. In addition to the testimony of the plaintiff providers, plaintiffs presented expert testimony of a well-qualified general surgeon licensed to practice medicine in South Carolina. According to the testimony of this witness, licensed physicians currently perform a number of surgical procedures in their private offices—particularly those which do not require the use of general anesthesia—because it is significantly quicker, less expensive, and more comfortable for the patient. The surgeon's testimony, in conjunction with the other medical evidence presented by the parties, reveals that the risks and potential complications associated with surgeries typically performed in the office setting by general surgeons are substantially similar to those associated with first trimester abortions. Significantly, the general surgeon testified that physicians' offices in which such comparable procedures are performed, including his own, would not comply with a number of the requirements imposed by Regulation 61–12, yet would meet appropriate standards of surgical care.

64. Plaintiffs also presented the testimony of a clinical assistant professor of nursing at the University of South Carolina, who has observed and/or participated in a total of twenty-five to fifty abortions performed in the first and second trimesters of pregnancy, and who currently provides follow-up care to women who have received abortions. According to this witness, licensed practical nurses are competent to provide nursing care during the abortion and recovery period, and such nursing care is adequate to meet the needs of the patients. The witness was further of the opinion that requiring a registered nurse to supervise all nursing care in a facility performing only first trimester abortions is unnecessary if a physician is supervising care, and that it is permissible to allow a licensed practical nurse to observe the recovery of an abortion patient while the

physician is in another room in the facility. In addition, the witness opined that, under current standards of practice, a registered nurse who is supervising nursing care in lieu of a physician would be unable to provide direct patient care.

### G. Additional Expert Testimony Presented

65. At the trial, the parties presented conflicting testimony of independent experts on the medical appropriateness of Regulation 61–12 and whether it would further or harm maternal health in South Carolina. This testimony is summarized below.

#### 1. David A. Grimes, M.D.

66. Plaintiffs called as an expert Dr. David A. Grimes. Dr. Grimes is a board certified physician in preventive medicine, with a specialty in public health, obstetrics and gynecology. He has over 25 years of experience with abortion procedures, as well as extensive experience in public health and abortion safety. He was asked to review the regulation by plaintiffs for the purposes of this case.

67. According to Dr. Grimes, ACOG and NAF publish guidelines and standards for abortion care to provide guidance to physicians in providing such care. They are not, however, a mandated standard of care. Rather physicians must be allowed to exercise their discretion in applying the guidance documents to meet the individual needs of their practices and patients.

68. Dr. Grimes also testified that it is not good medical practice to force costs upon patients which are not justified by the potential health benefits and that, in the private sector, this type of mandated medical care would not be tolerated by patients or, under managed care, by the insurance industry. Dr. Grimes testified that Regulation 61–12 will not further the health of women seeking abortions in South Carolina and, if enacted, will harm the health of women in South Carolina. It is his opinion that most of its requirements are medically unnecessary and unduly burdensome to women and abortion providers.

69. By way of example, Dr. Grimes testified that the sections requiring written policies and procedures on patient rights, quality improvement and operating procedures are unnecessary for a physician's office or small clinic, although they may be appropriate for a hospital. Similarly, clinical staff meetings are appropriate for a hospital, but not a physician's office where the employees work together in a small environment. According to Dr. Grimes, the mandatory medical testing requirements are medically baseless and a misuse of public health resources, and that these are the types of medical care decisions which should be made by a physician in consultation with the patient based upon individual risk factors and needs. For example, a mandatory urine pregnancy test imposes additional costs, but is superfluous if the physician has already confirmed pregnancy through a blood test or ultrasound. And a urinalysis is not necessary in all cases, and is not required prior to surgery even in a hospital environment. Dr. Grimes is also of the opinion that the physical plant requirements are burdensome and will not result in the improved health and safety of women. While some may be appropriate to a hospital or facility which deals with open wounds, this is not the case with a first trimester abortion. In addition, Dr. Grimes is of the opinion that the copying of medical records

is a violation of patient confidentiality. As he points out, the patient can give written consent for the release of medical records if the patient has a complaint.

### 2. Dr. Stanley K. Henshaw

70. Dr. Stanley K. Henshaw also testified via videotaped deposition. Dr. Henshaw received a Ph.D in sociology from Columbia University and a bachelor's degree in physics from Harvard College. He is currently deputy director of research at the Alan Guttmacher Institute in New York, where he conducts studies relating to family planning and abortion services.

71. Dr. Henshaw testified that an increase in the price of abortion procedures prevents a number of women from obtaining abortions and causes other women to delay their abortions until further along into their pregnancies. Dr. Henshaw also testified that relatively small increases will have this effect, and that an increase of just $25 can be expected to prevent one or two out of every 100 low-income women seeking an abortion from being able to obtain one.

72. Dr. Henshaw also testified that a decrease in the number of abortion providers in South Carolina will result in a decrease in the number of women who are able to obtain an abortion in the state, and a corresponding increase in the number of women who must travel out-of-state to obtain the procedure. Such a need to travel will, in turn, reduce the ability to obtain an abortion or result in a delay in obtaining the abortion. And the need to travel carries its own costs, which will increase the overall cost of obtaining the abortion and compound the financial problem.

### 3. Charles J. Ward, M.D.

73. At the trial of this case, defendants called as an expert Dr. Charles J. Ward, who is also board certified in obstetrics and gynecology, and a fellow of ACOG and the American College of Surgeons. However, while Dr. Ward has attended to patients experiencing spontaneous and missed abortions (or miscarriages), he has no experience in providing elective abortions and no particularized expertise in abortion practice or public health—nor has he witnessed an intended abortion. He has also not performed any gynecological surgery for approximately four years.

74. Dr. Ward agrees that abortion is one of the safest surgical procedures performed in the United States, and is also of the opinion that the majority of physicians practice to an acceptable level of care. However, Dr. Ward opined that Regulation 61–12 will improve the safety and well-being of women seeking abortions in South Carolina. More specifically, Dr. Ward testified that Regulation 61–12 incorporates, for the most part, current national standards applicable to the performance of abortions, will impose no burden upon medical providers who perform abortions in South Carolina, and will not hinder the medical judgment of physicians or their discretion in the performance of the procedure. Dr. Ward believes that the regulation is not only consistent with good medical practice, but medically necessary to protect the health and safety of women seeking abortions.

75. However, Dr. Ward formulated no opinion on whether implementation of the regulation would affect the cost or availability of abortions in South Carolina. He conducted no analysis on whether the costs asso-

ciated with regulatory compliance would pose a substantial obstacle to women seeking abortions or whether it would have the effect of harming women. Rather, Dr. Ward only opines that compliance with Regulation 61–12 will not impose a significant burden upon physicians who are already practicing to the standard of care reflected in the regulation. According to Dr. Ward, costs of providing medical care should not influence the provision of care and, in contrast to the testimony of Dr. Grimes and the general surgeon, opined that "you do not weigh the dollar when you're practicing good medicine." Tr. at 1041.

### H. Credibility of the Witnesses

76. Having observed the witnesses' demeanor and listened to their testimony, the court finds the testimony of Drs. Buffkin, Campbell, and Lynn to be credible based upon their extensive knowledge, training, and experience in providing first trimester abortions in South Carolina. Although they are owners of the abortion clinics challenging the regulation at issue, they are licensed to practice medicine by the State of South Carolina and are all board certified in obstetrics and gynecology. They have also been provided admitting privileges to hospitals in this state. Furthermore, they have been performing first trimester abortions in South Carolina on a regular basis for many years and there is no credible evidence that they have been providing services which do not meet acceptable standards of medical care. Nor is there any evidence that their patients have experienced significant complications from the abortion procedures.

77. Dr. Manning, whose testimony was submitted by deposition, is also licensed to practice medicine in this state and is board certified in obstetrics and gynecology. He has been performing first trimester abortions in this state for a number of years with no evidence of significant complications or an inadequate standard of care. His opinions are consistent with those of Drs. Buffkin, Campbell, and Lynn, and the court find his testimony to be credible as well.

78. The court also finds Dr. Grimes' testimony to be credible. Dr. Grimes has over 25 years of experience with abortion procedures, as well as specialized knowledge in abortion safety and public health. He too has provided testimony consistent with that of the other physicians who testified.

79. The court finds the testimony of the general surgeon to be particularly credible. Although he does not perform abortion procedures, he is a general surgeon licensed to practice medicine in this state and has provided valuable testimony about the current acceptable practice of performing surgery in an office setting and the general safety and tolerable risks associated with that practice.

80. Having observed the demeanor and testimony of Dr. Ward, the court discounts substantial portions of the evidence he submitted. Like Dr. Grimes, Dr. Ward was not involved in drafting Regulation 61–12 and was hired to review the regulation solely as an expert witness in this case. However, although Dr. Ward is board certified in obstetrics and gynecology, he has not performed any gynecological surgery in several years, has no experience in providing elective first trimester abortions, and has no particularized expertise in abortion practice or public health. In recent years, Dr. Ward has been hired primarily by parties in litiga-

tion as an expert witness in medical malpractice cases. He has also worked in academia, but has had limited involvement in the hands-on practice of medicine. Thus, Dr. Ward's expertise in areas determinative to this case is limited. In addition, Dr. Ward has formulated no opinion as to the regulation's probable effect on the cost or availability of abortions in South Carolina—factors which this court is required to consider in determining the constitutionality of the regulation. Furthermore, Dr. Ward appears to substantiate his opinion through a belief that the cost of medical services is irrelevant to the provision of quality medical care—an opinion which the court finds is contrary to the current trends and realities in the practice of medicine.

81. With regard to the DHEC medical witnesses, Dr. Goodrich and Mr. Lawyer, their testimony was presented to the court via depositions and an assessment of their credibility is more difficult. Having reviewed the deposition excerpts provided, however, the court notes that their experience with the provision of abortion services has been limited at best or occurred many years ago. For these reasons, the court discounts to a degree the value of their testimony.

## I. Costs to Comply with the Regulation

82. In compiling anticipated costs to comply with Regulation 61–12, plaintiffs independently reviewed the regulation and calculated the costs of bringing their respective clinics into compliance. In the case of the design and construction requirements, plaintiffs retained an outside construction specialist to inspect their facilities and provide a renovation estimate to comply. Plaintiffs presented evidence that CWMC would require renovations costing approximately $27,235, that PSMC would require renovations costing approximately $2,700, that Dr. Lynn's Beaufort office would need renovations costing approximately $12,256, and that GWC would need renovations costing approximately $3,700. In addition, plaintiffs presented detailed cost estimates to comply with the regulation's additional requirements—such as the costs associated with developing and implementing the numerous programs and policies, conducting the administrative reviews, ensuring the required staff training, and hiring additional staff. In each case, the costs were broken down into one-time costs, annual costs, and per-procedure costs. These figures were, in turn, provided to a certified public accountant who calculated the average "cost per-procedure" impact.

83. Defendants contend that the plaintiffs' cost figures are "grossly inflated," although not intentionally so. For example, they have variously contended as to certain items that plaintiffs misread the regulatory requirements or misinterpreted them, or that they have inaccurately estimated or improperly included costs associated with professional and staff time which will be taken by their compliance efforts. They have also taken issue with plaintiffs' inclusion of the cost associated with hiring a registered nurse to supervise nursing care, contending that the clinics can replace an existing licensed practical nurse and allow the registered nurse to both supervise and provide hands-on care. As to Dr. Lynn, defendants contend that he has demonstrated poor business practices which are the cause of his much higher compliance costs. Thus, defendants have taken plaintiffs' estimates, adjusted them for the errors they perceive, and provided the court

with an alternative cost increase figure.

84. Nevertheless, it is readily apparent that Regulation 61–12 will impose substantial start-up costs upon abortion providers in this state, and substantial annual costs to maintain compliance. As with any other business, these costs will be passed along to the patients in the form of increases in the price of receiving abortion services. And, of course, additional direct costs will be imposed upon plaintiffs through the performance of the mandatory medical testing.

85. Currently, a first trimester suction curettage abortion costs between $325 and $480, depending upon the gestational age, the type of sedation or anesthesia needed, and the medical testing indicated. According to the evidence presented, Regulation 61–12 will raise the cost of each abortion service in South Carolina in the following ranges: [10]

For CWMC, the cost will increase $36.48 to $75.03;

For PSMC, the cost will increase $93.09 to $170.39;

For Dr. Lynn's Beaufort practice, the cost will increase $115.67 to $367.50;

For GWC, the cost will increase $22.68 to 32.39.

86. At trial, the parties entered into the following stipulations of fact concerning the cost of complying with certain specific provisions of the regulations, as follows:

When directly billing physicians, laboratories in South Carolina generally charge between $20.00 and $40.00 per sample to perform a combined test for chlamydia and gonorrhea.

When directly billing physicians, laboratories in South Carolina generally charge between $17 and $30 per sample to test for the Du variant.

When directly billing physicians, laboratories in South Carolina charge between $7 and $20 per sample to perform a test for syphilis and between $10 and $22 to perform a test from a pap smear.

The range in charges for these tests varies due to a number of factors, including the number of samples that the physician submits to the laboratory for such tests. Discounts are generally offered when more tests are submitted.

A set of surgical instruments for performing the suction curettage abortion costs approximately $200.

87. Having reviewed all of the evidence presented, the court agrees with plaintiffs, and finds as a fact that compliance with Regulation 61–12 will be a costly endeavor which will result in a substantial rise in the cost of abortion services. The court also finds that the substantial alterations that Dr. Lynn must undertake in his practice, and the resulting extraordinary per procedure cost (even by defendants' estimate) will likely force him to cease performing abortions in his Beaufort office and, thereby, eliminate entirely the availability of abortions in this area of the state.[11]

10. The lowest figure represents defendants' revision of plaintiffs' estimates. The highest figure represents plaintiffs' estimate. Neither, however, takes into account the standard 15% profit factor which plaintiffs' accountant testified would be appropriate.

11. Defendants have sought to minimize the impact from the closure of Dr. Lynn's Beaufort office by pointing to Planned Parenthood's plans to open a clinic there in the future. However, as of the trial in this case, Planned Parenthood had not raised sufficient funds to open a clinic in the area. Furthermore, under the current plans, Planned Parenthood would not provide abortions up to 13.9 weeks (as Dr. Lynn does), and would offer the service for fewer hours and days. Simply stated, Planned Parenthood's potential to fill the void left by Dr. Lynn in this area of the state is speculative at best.

88. The court also finds as a fact, based upon the medical and other testimony presented, that the increased cost of providing abortions resulting from the regulation will prevent a significant number of women from obtaining an abortion or, at a minimum, delay them from obtaining the abortion, both of which carry increased risks to the health of women.

## J. Additional Findings

89. Based upon all of the reliable and credible evidence in this case, the court finds that the first trimester suction curettage abortion is one of the safest surgical procedures that can be performed. The procedure lasts approximately two to five minutes and has a relatively low overall complication rate. Suction curettage abortions can be, and are currently being, safely performed in physicians' offices and outpatient clinics, except where the patient has particular medical conditions that would require the procedure to be performed in an ambulatory surgical center or hospital. Medical abortions are also quick medical procedures that can be safely performed in a physician's office or outpatient clinic.

90. Physicians' offices and clinics that provide less than five first trimester abortions per month perform identical procedures to those which provide five or more first trimester abortions per month, and the risk to the patient undergoing the abortion procedure is identical. Offices and clinics that provide less than five first trimester abortions per month, however, are for inexplicable reasons exempt from any regulation or licensure by DHEC, and the patients seeking an abortion there are free to decide in consultation with their physicians what tests are appropriate.

91. First trimester suction curettage abortions are comparable in terms of risks, duration and invasiveness to a variety of obstetrical and gynecological surgical procedures which are frequently performed in physicians' offices in South Carolina. These would include suction curettage procedures performed on women who have experienced an incomplete spontaneous abortion, dilation and curettage procedures, endometrial biopsies, hysteroscopies, and insertion of intrauterine devices for birth control. Physicians' offices performing such procedures are, however, also not subject to DHEC regulation or oversight. Nor are their patients subjected to mandatory tests.

92. First trimester suction curettage abortions are also comparable in terms of risks, duration and invasiveness to a variety of non-obstetrical/gynecological surgical procedures that are frequently performed in physicians' offices in South Carolina. These would include the removal of subcutaneous lipomas and cysts, minor breast biopsies, and the removal of implanted ports and catheters which have been inserted into large veins in the neck and collarbone region for use in administering chemotherapy and dialysis. These physicians' offices are likewise not subject to DHEC regulation or oversight, nor are their patients subjected to mandatory tests.

93. South Carolina is not currently experiencing a public health problem related to the provision of first trimester abortions by licensed physicians, nor was the state experiencing such a problem when Regulation 61–12 was promulgated. There is no evidence that the plaintiffs or any other

abortion providers in South Carolina are providing inadequate care to women seeking abortions or that the rate of complications from abortions performed in South Carolina is greater than the national average. On the contrary, it appears that South Carolina has experienced a similar, if not lower, average complication rate. All of the witnesses with knowledge of the issue testified that they are aware of no serious medical complications resulting from the performance of a first trimester abortion in this state, and it is uncontested that the challenged regulation was drafted by DHEC in response to the state legislative directive and not in response to a public health problem in this state.

94. Although the principal draftsmen of Regulation 61–12 have some expertise in hospital and health care administration, they have no training or education in the provision of hands-on medical care and little knowledge of the medical needs of women seeking first trimester abortions in South Carolina. They engaged in virtually no research, investigation or other efforts to determine what types of requirements would be necessary or advisable for the procedure, or what types of requirements would further or hinder the state's interest in maternal health. Nor did DHEC officials possess or seek information concerning the present safety of first trimester abortions or the relative risks associated with the procedure.

95. Despite their admitted lack of medical knowledge in general and of abortion procedures in particular, the drafters of Regulation 61–12 also sought only minimal input and assistance from knowledgeable medical experts during the drafting process, choosing to rely solely upon the limited review and advice of Dr. Goodrich and Mr. Lawyer as to discrete portions of the regulation. Furthermore, DHEC either rejected or ignored an offer by ACOG to assist in the drafting process. While DHEC was under no legal obligation to consult with ACOG or to accept their assistance during the drafting process, ACOG is unanimously considered by the witnesses in this case—including those presented by defendants—to be a well-respected medical organization dedicated to improving the standard of health care in the field of obstetrics and gynecology. DHEC's rejection of their assistance further demonstrates their lack of interest in ensuring that the regulation actually met the proffered goal of promoting maternal health and is consistent with the testimony of the DHEC witnesses that such a goal was not their primary motivation during the drafting process.

96. Although it is uncontroverted that first trimester abortions are significantly less risky to the health of women than second trimester abortions, an existing South Carolina regulation governing second trimester abortions was utilized as a starting point for the new regulation. With the exception of Section 309 of Regulation 61–12, the drafters drew no distinction between first and second trimester abortions in the text of the regulation. In addition, the drafters admitted that virtually no such distinctions were considered during the drafting process.

97. Instead of attempting to tailor Regulation 61–12 to the particularized medical needs of women seeking first trimester abortion services in South Carolina, DHEC's orientation during the drafting process

was to standardize its health care and facility regulations and to codify existing departmental practices. To the extent this was done, it was done without any meaningful inquiry or assessment as to whether the requirements would further the state's interest in maternal health and without assessing whether first trimester abortions were comparable to the procedures performed in the other facilities regulated by DHEC. In particular, while DHEC has pointed to its regulation governing ambulatory surgical centers as support for Regulation 61–12, it is undisputed that offices and clinics that provide first trimester abortions provide services that are significantly less risky, invasive and lengthy than the services offered in ambulatory surgical centers. Yet many of the requirements of Regulation 61–12 are as stringent, or in some respects more stringent, that those imposed upon ambulatory surgical centers.

98. The Planned Parenthood, NAF, and ACOG standards and guidelines relied upon by DHEC are recommendations by the respective organizations and are not fairly characterized as mandated standards of care which can or should be imposed upon licensed physicians as regulatory requirements. Rather, they are guidelines which should be followed with due regard for the medical judgment of the treating physicians and the special needs of the patients they serve. Even if some of the existing guidelines could, in isolation, be appropriate matters for regulation, the current Regulation 61–12 imposes requirements which greatly exceed them.

99. In imposing the detailed requirements of Regulation 61–12, the DHEC drafters also failed to take any meaningful steps to evaluate the costs of compliance or its impact upon the availability of abortion services in South Carolina. Based upon the evidence presented, the court finds that Regulation 61–12 will significantly increase the cost of abortion services in South Carolina. This increase in the cost of abortion services will delay a significant number of women from obtaining the procedure and, in some cases, result in their inability to obtain the procedure. As a pregnancy advances, the medical risks associated with abortion increase, and a full term pregnancy and childbirth is much more risky to the physical health of a woman than a first trimester abortion.

100. Most likely as a result of these deficiencies in the drafting process, Regulation 61–12 consists of a myriad of detailed and costly provisions that were neither designed to further the health of women seeking first trimester abortions in South Carolina nor likely to accomplish this goal. Indeed, by imposing additional costs and impediments to women seeking abortions, the regulation may have the unintended effect of increasing the risk of adverse health conditions. The infirmities in the regulation are pervasive and a comprehensive recitation of the unnecessary and/or unduly burdensome provisions is neither possible nor necessary. A few examples should suffice:

a. Part I—The first, and most immediate, problem with Regulation 61–12 is found in its definitions of an abortion and of an abortion clinic, which in turn determines its scope. The applicability of the regulation is not limited to suction curettage abortions, or even to surgical abortions—nor is it limited to clinics operated by hospitals or non-physicians. And unlike the ambulatory surgical center regulation, there is no exemption for privately operated physicians' practices.

Thus, the regulation will be immediately applicable to any facility (other than a hospital) in which any second trimester and/or five or more first trimester abortions are performed per month—thereby encompassing within it a private physician's office. An abortion is defined as "[t]he use an instrument, medicine, drug, or other substance or device with intent to terminate the pregnancy of a woman, known to be pregnant, for reasons other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus," S.C.Code Regs. 61–12, Section 101.A., and would, therefore, include the medical abortions currently being used to terminate ectopic pregnancies. DHEC's own consultant, Dr. Goodrich, did not realize the definition was so all encompassing, and does not attempt to assert that the stringent provisions of Regulation 61–12 would be appropriate for a facility or physician performing only medical abortions. Furthermore, by directing that the regulation be applied to any facility performing five or more first trimester abortions per month, DHEC has ensured its applicability to all abortion and family planning clinics, as well as to all physicians who choose to regularly perform (i.e. more than five times per month) first trimester abortions in their private practice—yet it in no way regulates or limits the discretion of a licensed physician who performs the identical abortion procedures in his office on a less frequent basis.

b. Part II—Administration and Management. This portion of Regulation 61–12 is permeated with unnecessary requirements governing physician qualifications, staffing, and staff training. By way of example, the regulation requires physicians and clinics to hire a registered nurse to supervise all nursing care in the facility *regardless* of the fact that a licensed physician is present in the facility to supervise all medical care, including nursing care. The reliable and credible evidence presented reveals that it is within accepted medical practice, both within the abortion context and in physicians' offices performing comparable surgical procedures, for a physician to hire licensed practical nurses (who command a lower salary than registered nurses) so long as they act under the supervision of the attending physician. Clearly, a licensed physician is capable of supervising nursing care in the room in which he is performing the procedure. And defendants have offered no persuasive reason why a physician cannot supervise the nursing care of patients during the recovery process simply because the physician may be another room for a brief period of time. Indeed, DHEC's own medical consultant, Dr. Goodrich, opined that a registered nurse need not be on the premises to supervise care—only that the nurse have overall supervisory duties.

Similarly, the court finds inadequate justification for requiring physicians who perform first trimester abortions to have admitting privileges at a local hospital or a *written* transfer agreement with a physician who has such privileges. The state has a legitimate interest in ensuring that all outpatient surgery patients have access to appropriate emergency care when needed. And all of the abortion providers involved in this case, for example, have such privileges or have *verbal* transfer agreements to ensure that their patients will receive appropriate emergency care should the need arise. Plaintiffs contend that many physicians would be resistant to entering a written transfer agreement with abortion providers because, under other portions of the regulation, the agreement would be subject to copying and potential public dissemination. The court finds this to be a reasonable concern, given the controversial nature of abortions and the absence of any evidence that verbal transfer agreements have not in the past, or would not in the future, adequately meet the state's interest in this regard.

Other provisions of the regulation would seem to appear reasonable at first blush, but fail upon closer examination. For example, a requirement that all health care personnel receive tuberculin skin testing would appear to be very reasonable from a public health standpoint. However, DHEC has not required such testing of all health care personnel—choosing instead to impose the costly testing only upon clinics and physicians' offices which perform abortions on a regular basis. Defendants have offered no justification for arbitrarily requiring this testing of all abortion care workers, but not all other health care workers. Nor does it appear that they could do so. Similarly, Regulation 61–12's requirement that all allied health care personnel in abortion clinics receive CPR training would appear reasonable, but it too is a requirement imposed solely upon abortion providers who perform, according to all of the witnesses, one of the safest surgical procedures that is performed in this country. Furthermore, the credible evidence reveals that while it is prudent for all health care facilities and physicians' offices to have an employee trained in CPR available at all times, the regulation's requirement that *all* abortion clinic employees be trained is clearly unnecessary given the extremely low probability that a patient undergoing a first trimester abortion procedure will need such drastic treatment. And in keeping with the regulation's pervasive tendency to "overdo" every requirement, Sections 206–208 of the regulation do no more that require facilities and physicians to comply with laws they are already obligated to obey, on pain of additional penalties.

c. Part III. Patient Care. The level of policies and procedures required by this Part, as well as the extensive inservice training requirements and other policies required in Part II of the regulation, are also costly endeavors unsubstantiated by a medical need. As succinctly testified to by many of the medical experts in this case, such requirements may be appropriate for large medical care facilities with large staffs that do not interact on a daily basis. However, Regulation 61–12 arbitrarily imposes it upon every clinic and every physician's office which performs five or more first trimester abortions per month—regardless of the number of staff or hours of operation.

Furthermore, this portion of Regulation 61–12 unnecessarily restricts the medical discretion and judgment of treating physicians who are already licensed by this state and subject to oversight by the State Board of Medical Examiners. By mandating the presence of certain medical equipment and the performance of certain medical testing, Regulation 61–12 constitutes a regulatory intrusion into the physician-patient relationship and directly imposes costs upon patients which are not medically indicated a majority of the time—simply because the patient has chosen to undergo an elective abortion. For example, there is no reason to charge a patient seeking an abortion for a urine pregnancy test when the physician has already confirmed the pregnancy by other means (such as by a blood test or ultrasound). Nor has a rational explanation been offered for the regulation's mandate that every woman undergo (and pay for) testing for certain sexually transmitted diseases (but not others), without regard to whether such tests are medically indicated and indeed even when the physician determines that they are not, simply because the woman has chosen to obtain a first trimester abortion from a physician who performs them on a regular basis. Section 307's requirement that abortion providers have "consulting" arrangements with various specialists before they can obtain a license to operate is also medically unnecessary and unduly burdensome. The court has been made aware of no convincing reason why licensed physicians are not capable of exercising ap-

propriate discretion in recognizing and acting upon the medical needs of their patients in this regard.

The regulation also inexplicably imposes requirements concerning access to emergency drugs which are not imposed upon any other physicians and which, instead of improving health care, may well harm health care by imposing obstacles to accessing the drugs by the providers themselves. The equipment and supplies required by the regulation will also increase the costs of providing abortions in the state, and require equipment not necessary for the safe performance of the first trimester abortion procedure.

d. Part IV. Medical Records and Reports. This portion of the regulation also suffers from serious infirmities. For example, the apparent requirement that a woman seeking an abortion provide the name of her spouse in addition to an emergency contact is a medically and legally unnecessary requirement which imposes a substantial obstacle in the path of a woman who, for personal reasons, may wish not to disclose this information.

e. Parts V, VI, and VII of Regulation 61–12 suffer from similar infirmities. While a number of the provisions in these Parts would appear reasonable, they do not hold up under closer scrutiny. First, the provisions for "Functional Safety and Maintenance," "Infection Control and Sanitation," and "Fire Protection and Prevention" are not imposed upon physicians' offices where less than five first trimester abortions are performed per month, or where comparable surgical procedures are performed regardless of the frequency. For example, initially it would appear that regulations in the area of infection control and sanitation would be quite reasonable. However, they would be no more or less necessary in a first trimester abortion clinic than in a physician's office performing fewer than five procedures per month or in a physician's office performing comparable procedures.

In addition, the section is often duplicative of OSHA requirements, and admittedly requires autoclave testing with a frequency that is far greater than what is medically appropriate. Other of the provisions invite arbitrary enforcement (such as generically requiring that a facility be kept "free of hazards"), or impose requirements (such as the posting of a disaster preparedness plan and conducting quarterly fire drills) which may be appropriate for a large clinic or hospital, but not a small physician's office. In summary, these parts, and indeed the entire regulation, is pervaded with unnecessary regulatory requirements which are selectively, and without medical justification, imposed upon physicians and clinics solely because they perform first trimester abortions on a regular basis.

f. Part VIII, entitled "Design and Construction," suffers from similar problems. It imposes extensive and detailed design and construction requirements for abortion facilities which far exceed building code requirements applicable to other physicians' offices, including those that perform identical and comparable procedures. At trial, defendants presented the testimony of a well-qualified architect, who endorsed a majority of the design and construction requirements as being appropriate recommendations for a state of the art medical facility. This court has no doubt that the architect's designs are excellent ones. However, the reliable and credible medical evidence presented at trial leaves little doubt that these extensive requirements, while perhaps appropriate for a hospital or large ambulatory surgical center, are not justified by expected medical benefits to the women undergoing the relatively safe, first trimester suction curettage abortion in a small physician's office or clinic. Indeed, a number of the requirements are not purported to be ones advancing the interest of improving the health care for abortion patients, but rather are life safety issues

in the event of a disaster, fire or other event requiring evacuation. Furthermore, business occupancies which meet the design and construction requirements of standard building codes sufficiently meet these life safety concerns, and have not been required to "upgrade" to state of the art design and construction standards.

The additional requirements, which are advanced as unique to the medical field, simply find no justification in medical necessity. For example, there is no evidence supporting a need for physicians to install additional bathroom equipment and emergency call buttons or that they have a recovery area separate from the procedure area. Nor is there any evidence to indicate that physicians should be required to widen their doors and corridors to a width sufficient to accommodate both an ambulance stretcher and a· person walking alongside to perform cardiopulmonary resuscitation, particularly given the unanimous testimony that a first trimester abortion is a relatively safe procedure with infrequent complications. Indeed, there is no evidence that this need has ever arisen from the performance of a first trimester abortion in this state (or elsewhere). And, of course, physicians performing surgical procedures of comparable invasiveness and risk are not required to renovate their offices to meet a similar requirement. Perhaps least defensible of all is the fact that abortion facilities are required to fully comply with the design and construction requirements within two years from licensure, while facilities admittedly performing much riskier procedures (including ambulatory surgical centers) are grandfathered.

g. Part IX. Prerequisites for Initial Licensure. This portion suffers from similar problems as the design and construction portion of the regulation, requiring numerous certifications and laboratory test results concerning various parts of the facility (such as the carpets and draperies) without any evidence that the requirements will further the goal of protecting women's health in South Carolina.

h. Finally, Part X of the regulation, in conjunction with Section 103.C., grants to DHEC unfettered power to "manage[ ]" abortion providers "in accordance with the best practices as interpreted by the Department," S.C.Code Regs. 61–12, Part X, and to cite providers with a Class III violation and penalty if DHEC observes a condition deemed to be "against the best practices as interpreted by the Department," S.C.Code Regs. 61–12, Section 103.C. Simply put, in addition to the burdens imposed by Regulation 61–12's comprehensive, detailed provisions, the regulation imposes upon abortion providers the additional burden of determining and complying with standards or practices *not* specified in the regulation, but which DHEC may in the future find to be "best" for an abortion clinic.

## II. CONCLUSIONS OF LAW

### A. Due Process and the Right to Privacy

#### 1. Introduction

1. "Abortion is recognized as a fundamental right protected by the Due Process Clause of the Fourteenth Amendment." *Manning v. Hunt,* 119 F.3d 254, 259 (4th Cir. 1997).[12] This has been the case since *Roe v. Wade,* when the United States Supreme Court held that the "right of privacy ... founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action ... is broad enough to encompass a woman's decision whether or not to termi-

---

**12.** The Fourteenth Amendment states in pertinent part that "... nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

nate her pregnancy." 410 U.S. 113, 153, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Under *Roe,* state laws and regulations restricting the right could only be allowed if they were supported by a compelling state interest and were narrowly drawn to express the interest. *See id.* at 155, 93 S.Ct. 705.

2. The Supreme Court in *Roe,* however, recognized that the right to choose "is not unqualified," *id.* at 154, 93 S.Ct. 705, and that it must be considered against important and legitimate state interests in preserving and protecting the health of the pregnant woman and in protecting the potentiality of human life, *see id.* at 154, 162, 93 S.Ct. 705. To assist in weighing the competing interests of the woman and the state, the *Roe* Court adopted a "trimester framework," designed to delineate when the state's interest became sufficiently compelling to justify the state's limitation of or infringement upon the right. Specifically, the state's interest in the health of the pregnant woman was considered to be compelling at the end of the first trimester, after which time the state could "regulate the abortion procedure to the extent that the regulation reasonably relat[ed] to the preservation and protection of maternal health." *Id.* at 163, 93 S.Ct. 705. Prior to that point in time, however, the abortion decision was to be left to the physician's medical judgment, in consultation with the woman. *See id.* After viability, the state's interest in potential life became compelling, and the state was free to regulate and even prohibit the abortion procedure except when an abortion was necessary to preserve the life or health of the mother. *See id.* at 163–64, 93 S.Ct. 705.

3. In the years following *Roe,* application of its trimester framework resulted in almost no regulation being permitted during the first trimester of pregnancy. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 872, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). But because a woman's constitutional liberty to have some freedom to terminate her pregnancy was not unlimited, "[t]he extent to which the legislatures of the States might act to outweigh the interests of the woman in choosing to terminate her pregnancy was the subject of debate both in *Roe* itself and in decisions following it." *Id.* at 853, 112 S.Ct. 2791.

4. In *Casey,* a majority of the United States Supreme Court reaffirmed the "essential holding" of *Roe,* maintaining that a woman's right to choose an abortion is a fundamental one protected by the Due Process Clause of the United States Constitution, but one which must be weighed against the state's legitimate interests in preserving and protecting the health of women seeking abortions and in the potentiality of human life. *See Casey,* 505 U.S. at 846, 112 S.Ct. 2791. A plurality of the Court, however, rejected the rigid trimester framework of *Roe.* Although maintaining that "the line should be drawn at viability, so that before [viability] the woman has a right to choose to terminate her pregnancy," *Casey,* 505 U.S. at 870, 112 S.Ct. 2791, the *Casey* plurality sought to reaffirm, and afford more weight, to the state's "legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child," *id.* at 846, 112 S.Ct. 2791. Specifically, the plurality observed that:

[t]hat portion of the decision in *Roe* ha[d] been given too little acknowledgment and implementation by the Court in its subsequent cases. Those cases decided that any regulation touching upon the abortion decision

must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest. *Id.* at 871, 112 S.Ct. 2791.

5. Noting that "not every law which makes a right more difficult to exercise is, *ipso facto,* an infringement of that right, *id.* at 873, 112 S.Ct. 2791, the *Casey* plurality articulated an 'undue burden' standard as 'the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty,'" *Casey,* 505 U.S. at 876, 112 S.Ct. 2791, thereby seeking to modify the standard for evaluating state regulations which impact the abortion decision prior to viability, including those within the first trimester of pregnancy. After viability, the State could continue to "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 879, 112 S.Ct. 2791 (internal quotation marks omitted).

6. As noted by the Fourth Circuit, "[t]he difficulty presented to lower federal courts following *Casey* lies in the fact that only three justices— Justices O'Connor, Kennedy, and Souter—have specifically adopted this undue burden standard." *Manning,* 119 F.3d at 260. The Fourth Circuit, however, "deem[ed] it proper to follow the trend clearly set by other courts" and to apply the "undue burden" test to challenges brought against state laws regulating abortion. *Id.* at 261.

7. A question remains, however, as to what plaintiffs must show to successfully mount a facial challenge to an abortion regulation. In *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), the Supreme Court held that a party asserting a facial challenge to a legislative Act is required to "establish that no set of circumstances exists under which the Act would be valid," *id.* at 745, 107 S.Ct. 2095. The fact that the Act "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.* Since *Casey* was decided, however, the circuits have been divided on the issue of whether the Supreme Court *sub silentio* overruled *Salerno*'s "no set of circumstances" test for facial challenges to state laws regulating abortion, requiring instead that the challenger only show "that in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. 2791; *see Manning,* 119 F.3d at 268–69, n. 4 (discussing division of authority on the issue); *Planned Parenthood of the Blue Ridge v. Camblos,* 155 F.3d 352, 358–59 n. 1 (4th Cir.1998) (*en banc*) (same); *id.* at 381 n. 14 (same); *id.* at 389 n. 2 (Michael, J. concurring) (concluding *Salerno* no longer applies in this context).

8. In granting plaintiffs' motion for a temporary restraining order on July 19, 1996, this court ruled that it intended to follow those courts which had held that *Casey* implicitly superseded the *Salerno* "no set of circumstances" test for challenges to abortion regulations. Since that time, however, the Fourth Circuit has touched upon the conflicting views on this issue, albeit not directly deciding it. In *Manning,* the court applied the *Salerno* standard of review to an abortion statute, but plaintiffs did not challenge its applicability. *See Manning,* 119 F.3d at 268–69. In dicta, however, the three-member panel suggested that the court would nonetheless apply the *Salerno* standard until the Supreme Court explicitly overruled it, stating that:

[i]t is not the province of the court of appeals to predict how the Supreme

Court will ultimately rule on an issue. *Casey* does not specifically overrule *Salerno*. At the moment, the most that can be said is that three Justices have indicated a desire to do so. Until the Supreme Court specifically does so, though, this Court is bound to apply the *Salerno* standard as it has been repeatedly applied in the context of other abortion regulations reviewed by the Supreme Court.

*Id.* at 269 n. 4; *see also Camblos*, 155 F.3d at 381 n. 14 (noting the *Manning* dicta, but not deciding the question); *id.* 155 F.3d at 389 n. 2 (Michael, J., concurring) (asserting that the *Casey* undue burden test must be applied to facial challenges to abortion restrictions).

9. As a result of the uncertainty which remains concerning the appropriate standard to be applied in this case, the court will review Regulation 61–12 under both the *Casey* and *Salerno* standards. In addition, the court is mindful that, when presented with a challenge to the constitutionality of a state statute, it should construe the law, if possible, to avoid a finding of unconstitutionality. *See Ohio v. Akron Reprod. Health Ctr.*, 497 U.S. 502, 514, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990); *Camblos*, 155 F.3d at 383. However, " 'federal courts are without power to adopt a narrowing construction of a *state* statute [to avoid constitutional difficulties] unless such a construction is reasonable and readily apparent.' " *Virginia Soc'y for Human Life, Inc. v. Caldwell*, 152 F.3d 268, 270 (4th Cir.1998) (quoting *Boos v. Barry*, 485 U.S. 312, 330–31, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)) (emphasis in original).

### 2. The Undue Burden Test

10. Under *Casey*, the State of South Carolina may regulate the performance of abortions, even those during the first trimester of pregnancy, in order to further legitimate state interests in the health of the mother and the life of the fetus. However, the woman maintains her fundamental right "to choose to have an abortion before viability and to obtain it without *undue* interference from the State," *Casey*, 505 U.S. at 846, 112 S.Ct. 2791 (emphasis added) and "the State's interests [prior to viability] are not strong enough to support a prohibition of abortion or the imposition of a *substantial obstacle* to the woman's effective right to elect the procedure," *id.* (emphasis added).

11. In *Casey*, the Supreme Court was presented with constitutional challenges to various provisions in a Pennsylvania statute governing informed consent, parental consent, recordkeeping and reporting requirements, and a medical emergency exception. Thus, the plurality opinion focused on the state's legitimate interest in the potentiality of human life—holding that to promote this "profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and [that] measures designed to advance this interest will not be invalidated so long as their purpose is to persuade the woman to choose childbirth over abortion" and they do not impose "an undue burden on the right." *Id.* at 878, 112 S.Ct. 2791.

12. Nevertheless, the *Casey* plurality also provided guidance by addressing the state's concomitant, and equally legitimate, interest in preserving and protecting the health of women seeking abortion services— of particular relevance to the challenge in this case. Specifically, the *Casey* plurality held that:

As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or

effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right. *Id.* at 879, 112 S.Ct. 2791.

13. The types of burdens that may be imposed by state regulation are varied in nature, but clearly include financial burdens which restrict or prohibit the exercise of the right. As noted by the *Casey* plurality: [n]umerous forms of state regulation might have the incidental effect of increasing the cost or deceasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a *valid purpose,* one not designed .to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where the state regulation imposes an *undue burden* on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

*Id.* at 874, 112 S.Ct. 2791 (emphasis added).

14. Furthermore, "[n]ot all burdens on the right to decide whether to terminate a pregnancy will be undue." *Id.* at 876, 112 S.Ct. 2791. A finding of an undue burden is a shorthand for the conclusion that a state regulation has the *purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.* A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice *cannot be considered a permissible means of serving its legitimate ends.*

*Id.* at 877, 112 S.Ct. 2791 (emphasis added).

15. Although the *Casey* court was not presented with regulations similar to those at issue in this case, previous Supreme Court cases provide additional guidance as to the appropriate level of regulations designed to protect the health of women seeking abortions. First, in *Roe,* the Supreme Court recognized that:

*abortion in early pregnancy, that is, prior to the end of the first trimester, although not without its risk, is now relatively safe.* Mortality rates for women undergoing early abortions, where the procedure is legal, appear to be as low as or lower than the rates for normal childbirth. Consequently, any interest of the State in protecting the woman from an inherently hazardous procedure, except when it would be equally dangerous for her to forego it, has largely disappeared. Of course, important state interests in the areas of health and medical standards do remain. The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.

*Roe,* 410 U.S. at 149–150, 93 S.Ct. 705 (emphasis added). In addressing permissible state regulation to serve the legitimate goal of maternal health *after* the first trimester of pregnancy, the *Roe* court held that:

a State may regulate the abortion procedure to the extent that the regulation *reasonably relates* to the preservation and protection of maternal health. Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic

or some other place of less-than-hospital status; as to the licensing of the facility; and the like.

*Id.* at 163, 93 S.Ct. 705 (emphasis added). Applying these principles in the companion case of *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), the Court simultaneously invalidated a Georgia law requiring that all first trimester abortions be performed in a licensed hospital where the state failed to show that only the hospital environment could ensure the quality of the operation and the protection of the patients. *Id.* at 195, 93 S.Ct. 739.

16. Later, in *City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), the Supreme Court was presented with a challenge to an Ohio ordinance which, among other things, required all second trimester abortions to be performed in a hospital. Reaffirming the prohibition against over-regulation of a relatively safe surgical procedure, the Court held that:

[t]he State's discretion to regulate on th[e] basis [of maternal health] does not ... permit it to adopt abortion regulations that depart from accepted medical practice.... If a State requires licensing or undertakes to regulate the performance of abortions during this period, the health standards adopted must be "legitimately related to the objective the State seeks to accomplish."

*Id.* at 431, 103 S.Ct. 2481 (quoting *Doe,* 410 U.S. at 195, 93 S.Ct. 739). The Court then invalidated the ordinance, holding that it "imposed a heavy, and unnecessary, burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure." *Id.* at 438, 103 S.Ct. 2481.[13]

17. Circuit courts of appeal called upon to address the propriety of comprehensive health regulations, after *Roe* but before *Casey,* have similarly invalidated them when there was an insufficient nexus between the nature of the medical procedure and the extent of the regulation. *See e.g., Birth Control Ctrs., Inc. v. Reizen,* 743 F.2d 352, 364–65 (6th Cir.1984) (invalidating detailed, specific regulatory criteria governing the physical layout of abortion facilities, staffing requirements, and equipment requirements); *Ragsdale v. Turnock,* 841 F.2d 1358 (7th Cir.1988) (invalidating portions of a similar licensure regulation which mandated, among other things, detailed physical plant requirements, policies and procedures, and staff training requirements.)

18. The plurality opinion in *Casey* rejected the trimester framework of *Roe* in order to afford greater recognition to the states' legitimate interests in maternal health and potential life *during* the first trimester of pregnancy. Thus, *Casey* may fairly be said to now allow states to regulate in areas previously thought to be improper, i.e. medical facilities performing first trimester abortions. However, there is no indication that the Supreme Court would now approve state regulation which substantially disregards the training, discretion and judgment of the licensed physician performing the relatively safe, first trimester suction curettage abortion. On the contrary, the *Casey* Court repeatedly reaffirmed the essential holding of *Roe* and

**13.** The Supreme Court in *Casey* overruled those parts of *Akron* which were "inconsistent with *Roe*'s statement that the State has a legitimate interest in promoting the life or potential life of the unborn," *see Casey,* 505 U.S. at 870, 112 S.Ct. 2791, but reaffirmed the essential holding of *Roe.* Thus, the *Akron* decision continues to inform this court as to the propriety of regulations purportedly enacted to further the state's interest in maternal health.

specifically counsels this court to examine purported health regulations for medical necessity. *Casey,* 505 U.S. at 879, 112 S.Ct. 2791. In addition, *Roe*'s discussion regarding the relative health care needs of abortion patients is consistent with the medical evidence presented in this case—indeed, it can be fairly concluded that advances in medical care have rendered the first trimester abortion an even safer procedure today. At a minimum, *Roe* and *Casey* counsel this court to be particularly mindful of the relative safety and low risks associated with first trimester abortions in evaluating whether the requirement of Regulation 61–12 are medically necessary, and in evaluating whether they reasonably relate to the stated goal of protecting and preserving the health of women seeking such abortions in the State of South Carolina. *See Casey,* 505 U.S. at 878, 112 S.Ct. 2791.

19. Guided by these precedents, the court concludes that the State of South Carolina has a legitimate interest from the outset of pregnancy in protecting the health of women seeking abortions, and that this interest is sufficiently important to allow the State to regulate abortion providers, including providers which limit their services to abortions during the first trimester of pregnancy. *See Casey,* 505 U.S. at 876, 112 S.Ct. 2791. Furthermore, this interest would allow the state to regulate, within the boundaries of *Casey* and its predecessors, such matters as the qualifications of the person performing the procedure, the facilities in which abortions are performed, and the availability of medical care after the procedure and in the event of an emergency. *See Roe,* 410 U.S. at 149–50, 163, 93 S.Ct. 705.

20. However, just as the woman's fundamental right to obtain an abortion is not limitless, the state's power to regulate in these areas is not unfettered. To withstand constitutional scrutiny, Regulation 61–12 must first be designed to further the state's legitimate goal of protecting and preserving the health of women seeking abortions and must be reasonably related to that goal. *See Casey,* 505 U.S. at 878, 112 S.Ct. 2791; *Roe,* 410 U.S. at 163, 93 S.Ct. 705. *Casey* and its predecessors inform us that health regulations which are unnecessary, not reasonably related to maternal health, or which depart from accepted medical practice, cannot withstand constitutional scrutiny and must be invalidated. *See Casey,* 505 U.S. at 878, 112 S.Ct. 2791; *Akron,* 462 U.S. at 431, 103 S.Ct. 2481; *Roe,* 410 U.S. at 163, 93 S.Ct. 705. Furthermore, even if Regulation 61–12 furthers the interest of protecting and preserving the health of women seeking abortions, the regulation cannot stand if it imposes an undue burden on a woman's fundamental right to obtain an abortion, *see Casey,* 505 U.S. at 877–78, 112 S.Ct. 2791, as a regulation which has "the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* at 877, 112 S.Ct. 2791.

a. **S.C.Code Regs. 61–12 was not designed to and does not further the state's legitimate interest in maternal health.**

21. Having carefully reviewed the evidence presented in this case, the court concludes that Regulation 61–12 is unconstitutional under the

Due Process Clause of the United States Constitution because it was not designed to and does not further the state's legitimate interest in maternal health.

22. Although the DHEC officials responsible for drafting and finalizing Regulation 61–12 may have set out to promulgate some portions of the regulation to serve the state's interest in promoting and preserving the health of women seeking abortions, they have failed in that endeavor. Simply put, they have gone too far—imposing costly requirements that are at best medically unnecessary and at worst contrary to accepted medical practice.

23. As an initial premise, the court agrees with plaintiffs' contention that defendants may not rewrite the regulation to correct its constitutional infirmities. Defendants may not offer such "stipulations" without plaintiffs' consent, and they are more properly considered to be concessions by defendants that there are defects in the sections referenced. Nor can the court consider them to be a reasonable interpretation of the language of the referenced sections. The statutory sections which are relied upon to ensure confidentiality are contained within a separate chapter of Title 44 of the South Carolina Code of Laws. Even if they were applicable to abortion facilities, the language is insufficient to ensure the confidentiality of patients seeking abortion services. The remainder of the proffered "stipulations" are clearly intended to rewrite the text of the sections at issue.

24. Furthermore, the court concludes that the infirmities in the regulation go far beyond those sections which defendants seek to correct through their stipulations. Rather, the evidence in this case reveals, and the court concludes, that the very drafting and promulgation process surrounding Regulation 61–12 ensured its failure to serve the permissible constitutional goal of preserving and protecting the health of women seeking abortions.

25. The evidence is undisputed that a first trimester abortion is a relatively safe medical procedure with minor risks to the health of the woman. However, the DHEC officials charged with the task of drafting and promulgating Regulation 61–12, while possessing some expertise in the area of hospital administration, had no formal medical education or training, sought no significant input or assistance from knowledgeable medical professionals, rejected assistance from a reputable medical organization, and conducted no meaningful inquiry into what standards of care should be mandated in view of the relatively minor risk level associated with a first trimester abortion procedure. Instead, the DHEC officials have conceded that the regulation was drafted primarily from the prior state regulation governing second trimester abortion facilities and from other DHEC regulations governing other types of health care facilities and procedures, in an attempt to "standardize" its health care regulations.[14] Thus, it is hard-

14. DHEC may have a legitimate interest in standardizing its health care regulations and codifying existing departmental practices. However, this court is not called upon to decide whether this interest has been appropriately served. DHEC did not adopt new regulations applicable to all outpatient care facilities, including abortion clinics. Nor did DHEC adopt new regulations which would be applicable to all physicians performing surgical procedures in their offices or even to all physicians performing abortions in their practices. Instead, DHEC promulgated extensive medical care regulations aimed solely at abortion providers who regularly perform abortion procedures, without meaningful input from medical professionals and without re-

ly surprising that the regulation imposes numerous requirements which are medically unnecessary for the safe performance of first trimester abortions.

26. The medical evidence exposing the constitutional infirmities is overwhelming. Plaintiffs have presented this court with extensive testimony and evidence proving that first trimester abortions can be and are being safety performed in existing physicians' offices and clinics, and that South Carolina is not currently experiencing any *public* health problem with the performance of first trimester abortions. Regulation 61–12, however, imposes extensive, unduly restrictive, and costly requirements upon physicians and clinics which, in some cases, conflict with or go beyond accepted medical practice for first-trimester abortions and which collectively impose substantial costs and other burdens upon the providers and the patients. Every part of the regulation, and nearly every section, contains requirements which are unnecessary to the provision of quality health care to women seeking abortions or are not designed, by DHEC's own admission, to further that interest. And the regulation as a whole imposes burdensome requirements that far exceed those applicable to physicians' offices which perform procedures which are substantially similar, and in some cases identical, to a first trimester suction curettage abortion.

27. The specific requirements of Regulation 61–12 which find no basis in medical necessity are too numerous to mention, and the extensive na-

ture of the regulation and its obviously unnecessary detail cannot be fully appreciated without a complete reading of its text. The unnecessary provisions permeate virtually every section, and to identify them individually and recount the evidence demonstrating their excessiveness could double the length of this order. If called for, this court would not hesitate to accept the task; but after spending months reviewing all aspects of this case, the court cannot help but conclude that the constitutional problems with this regulation are so numerous and pervasive that their elimination would leave a hollow regulation. A few examples should suffice.[15]

28. As an initial matter, Regulation 61–12 is riddled with unnecessary requirements that place excessive burdens on physicians' offices and clinics *solely* because five or more first trimester abortions are performed there per month. In isolation many of the provisions would sound like good ideas; however, the testimony from the medical experts whom this court found credible reveals that many of these individual provisions contain requirements that should not be mandated in every case as this regulation would dictate. For example, testing a person for particular sexually transmitted diseases might sound like a good idea. But where there are no symptoms or other accepted medical reasons or risk factors to justify such a test, there is no reason to test a woman for them just because she seeks an abortion. Yet this, as an example,

gard to the safety needs and risks specific to the abortion procedure. And many of the requirements contained within Regulation 61–12 go beyond even those requirements imposed upon, for example, ambulatory surgical centers which clearly perform surgical proce-

dures which carry an increased risk to the health and safety of its patients.

15. Additional examples can be found in the court's findings of facts.

is what several of the provisions do—they require the physicians affected by the regulation to abdicate their own medical judgment and to test every pregnant woman who wants an abortion for selected sexually transmitted diseases, regardless of the medical justification.[16] Similarly, the regulation requires the administration of a urine pregnancy test to all women, regardless of whether the physician has confirmed the pregnancy through other means.

29. Not only does the regulation mandate medical tests that the testimony shows to be uncalled for, but it also places administrative burdens on the clinics which are clearly inappropriate to medical offices of such small sizes as these offices and clinics. For example, DHEC has mandated—without regard to the number of staff or size of the clinic—the development of extensive policies and procedures, frequent staff meetings, formal inservice training and required staff certifications, and medical testing of employees which, while probably appropriate for a hospital or large outpatient surgical center, are unnecessary in a small physician's office or clinic. With regard to the design and construction requirements, the refusal to grandfather existing clinics is unprecedented and no explanation has been given as to why existing abortion clinics are compelled to be in full compliance within two years, while other regulated health care facilities (including ambulatory surgical centers which admittedly perform more risky and invasive surgical procedures) are subjected to less stringent design and construction

regulations *and* are permitted to perform surgery in their existing facilities until they choose to undergo substantial renovations. *See, e.g.,* S.C.Code Regs. 61–91, Section 2001–2005 & 2106. On top of this, DHEC does not show how the extensive renovations required will further the health of women seeking abortions in South Carolina—and no explanation is offered as to why all of these requirements are so much greater for these clinics than they are for other physicians' offices performing the same type of procedures.

30. In addition, the regulation, and in particular those portions pertaining to patient care, seeks to walk the licensed physician through the abortion procedure and recovery period with minimal if any regard for the fact that the physician is already required to have obtained a license to practice medicine from the State Board of Medical Examiners. It regulates the procedure from the content of the initial medical record through discharge of the last patient, and everything in between. By requiring such things as the medication to be kept and the tests which must be administered, the regulation strikes at the heart of the physician-patient relationship and ignores the physician's training and experience—including the professional requirement that the physician assess each patient individually and exercise discretion in order to serve the best interests of the patient. Similarly, no acceptable explanation has been provided as to why only a registered nurse, as opposed to a licensed physician, can supervise nursing

16. Defendants apparently seek to have this court conclude that the selected diseases are much more prevalent in women seeking abortions or that abortion clinics present a public health problem in this regard. Even assuming such a finding would support the regulatory requirement, defendants have simply presented insufficient evidence to support such a finding.

care in the facility, and the credible medical evidence before the court indicates that this requirement is also unnecessary.

31. Despite the fact that there is no evidence of any abortion providers in the state rendering unsanitary or otherwise inadequate care, or that the Board of Medical Examiners is not able to discipline its own,[17] many of the other provisions of Regulation 61–12 border on the absurd. For example, the regulation requires that the entire facility "be kept ... free from odors" and that all outside areas "be kept free of rubbish, grass, and weeds that may serve ... as a haven for insects, rodents and other pests." S.C.Code Regs. 61–12, Sections 604 & 606. And, despite the fact that the existing level of detail would seem to defy continuous compliance by even the best of facilities, DHEC has granted itself authority to impose penalties for any condition which, while not mandated or prohibited by the regulation, DHEC deems to be "against the best practices" as later defined by the department. S.C.Code Regs. 61–12, Section 103.C & Part X. By attempting to regulate such "common sense" items in minute detail, the regulation subjects physicians to unnecessary uncertainty in the operation of their practices and invites arbitrary enforcement.

32. While this court recognizes that some of the provisions of Regulation 61–12 are contained in other DHEC regulations governing other health care facilities, Regulation 61–12, unlike the other regulations, is directed to and impacts upon a medical procedure which has been afforded constitutional protection. And the court cannot ignore that abortion, unlike other types of surgical procedures, is the subject of much controversy, debate, and protest in this country. It is not sufficient simply to argue that because some of the provisions apply to other types of medical facilities and procedures, they are properly applied to first trimester abortions. Regulation 61–12 must be subjected to closer scrutiny, and a showing made that its provisions are, as an initial matter, rationally and legitimately related to the state's interest in preserving and protecting maternal health and that they will likely serve this goal. No such showing has been made in this case. On the contrary, DHEC took no meaningful steps to ensure that the provisions of S.C. Regs. 61–12 were designed to promote maternal health in the context of abortion care or to ensure that its provisions rested upon a reasonable medical basis. No doubt as a result of this uninformed endeavor, the regulation fails to serve the state's legitimate interest in preserving and protecting the health of women seeking first trimester abortions in this state and cannot be enforced on this basis alone. *See Casey*, 505 U.S. at 877–78, 112 S.Ct. 2791.

---

17. Defendants have sought to defend the comprehensive nature of some of the regulatory requirements on the basis that some abortion clinics are owned and operated by non-licensed third parties who, unlike South Carolina physicians, require such detailed direction in the proper provision of medical care. As a general premise, the court agrees that some additional or different regulations may be appropriately applied to such facilities. However, the court cannot render findings and conclusions as to the appropriate level of such regulation because DHEC did not draw any such distinction in drafting the regulation at issue. Indeed, unlike the DHEC regulation for ambulatory surgical centers which exempts private physicians performing surgical procedures in their offices, DHEC made no attempt to distinguish or exempt from the requirements licensed physicians, such as Drs. Buffkin, Campbell, and Lynn, who perform abortions in their private practices.

33. Finally, in addition to the evidence that Regulation 61–12 will not serve the goal of preserving and protecting the health of women, plaintiffs have presented persuasive evidence that the regulation will have the opposite effect. Specifically, because the regulation will result in a substantial increase in the cost of obtaining an abortion in South Carolina, a significant number of women will be forced to either delay having an abortion, or forego having one altogether, which will serve to increase health risks and diminish the safety of women seeking abortions in South Carolina.

**b. S.C.Code Regs. 61–12 has the effect of imposing an undue burden on the woman's right to obtain an abortion**

34. It is true, as defendants contend, that all state regulations impose some costs upon consumers and that all burdens on a woman's right to obtain an abortion will not be undue. However, states may not impose regulations, even those which result in minor costs, which serve no legitimate state interest and which are in conflict with the standards imposed by current medical practice. Given the lack of evidence that the regulation will operate to improve the health care currently being received in this state, and the substantial evidence that it may well have the opposite effect, the court concludes for the reasons discussed throughout this order that Regulation 61–12 must be invalidated. In addition, however, the regulation fails because it places a substantial obstacle in the path of women seeking first trimester abortions and, thereby, imposes an undue burden on the woman's fundamental right to choose to undergo the procedure. *See Casey*, 505 U.S. at 877–78, 112

S.Ct. 2791. Thus, even were the court to assume that Regulation 61–12 could further the state's legitimate interest in protecting maternal health, it must still be found unconstitutional. *Id.*

35. Currently, a first trimester abortion costs between $325 and $480, depending upon the gestational age and the type of sedation or anesthesia given to the patient. The evidence in this case is that Regulation 61–12 will have the effect of increasing the cost of obtaining an abortion, at a minimum, between $30.00 and $75.00. In one area of the state, it will result in an increase of between $100 and $300, or result in the elimination of services altogether.

36. A significant increase in the cost of providing or obtaining an abortion alone can constitute a substantial obstacle to a woman seeking an abortion. *See e.g., Casey*, 505 U.S. at 901, 112 S.Ct. 2791. By causing delays in the woman's financial ability to obtain an abortion, the regulation will cause the woman to undergo abortion later in the pregnancy, or forego the procedure altogether, both of which result in a higher cost and higher medical risk for the woman. The decreased availability of abortions due to closure of an abortion clinic also constitutes a substantial obstacle to women seeking abortions. And increasing the distance a woman has to travel to obtain an abortion increases the costs for the woman, again resulting in delay or the inability to obtain an abortion.

37. Less tangible burdens are also imposed by the regulation. For example, the regulation grants DHEC inspectors the right to inspect abortion clinics at will and without limitation—and such in-

spections can be initiated by anonymous complaints. During any such inspection, the inspectors are also granted the right to copy confidential patient records. Although defendants contend that the records would be kept confidential according to DHEC's internal "policy," the regulation ensures no such protection. Indeed, according to the evidence presented, DHEC would still retain the discretion to utilize such records in proceedings to enforce the regulation. This lack of sufficient confidentiality is further compounded by the fact that the regulation requires patients to disclose information, such as their husband's name, which is not necessary for the provision of safe medical care and which the patient may, for a number of reasons, prefer not to disclose. And the regulation requires the clinic to conduct follow-up reviews to include, in some cases, obtaining input from the patient's family members. Thus, the regulation not only raises the monetary cost of abortion services. It threatens patient confidentiality, grants DHEC inspectors unlimited discretion to inspect abortion facilities, allows anonymous third parties to lodge complaints to prompt such investigations, and results in an unnecessary intrusion into the patient's relationship with her physician and her family members. Thus, recognizing the fundamental nature of the right at issue and its controversial nature, the court concludes that the regulation imposes significant additional, and unnecessary, burdens upon patients seeking abortion services in the state.

### 3. Facial Invalidity of the Regulation

38. The court now turns to the issue of whether Regulation 61–12 is facially invalid, and the accompanying issue of the test to be applied.

39. First, for all of the reasons set forth in this order, this court concludes that "in a large fraction of cases in which [the regulation] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. 2791. However, it equally fails *Salerno*'s "no set of circumstances" test, which would require plaintiffs "to show that under no set of circumstances can the [regulation] be applied in a manner which is not an undue burden on [a woman's] right to obtain an abortion." *Manning*, 119 F.3d at 269. In applying the *Salerno* test, this court must determine whether the regulation "can be construed in such a manner that [it] can be applied to a set of individuals without infringing upon constitutionally protected rights." *Rust v. Sullivan*, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). And the court may not invalidate the regulation "based upon a worst-case analysis that may never occur." *Ohio v. Akron Reprod. Health Ctr.*, 497 U.S. at 514, 110 S.Ct. 2972.

40. The detailed requirements of Regulation 61–12 apply to *every* physician's office or other medical facility in which *five or more* first trimester abortions are performed per month, and to *every* woman who chooses to have the procedure performed in such a facility. Given the unduly detailed and restrictive requirements imposed by the regulation, and the lack of a sufficient nexus between these requirements and the stated goal of protecting and preserving maternal health, the court concludes that the regulation cannot be applied in a manner which is not an undue burden on the fundamental right to obtain an abortion. Although certain discrete portions of

the regulation afford discretion in the manner of enforcement, the instant case simply does not present a regulatory requirement which, when presented in the "worst case" scenario, only operates in the "rare case" to present an undue burden. *Id.* The vast majority of Regulation 61–12's provisions are specific and detailed—and once effective, would immediately require all abortion providers, including those already safely administering the procedure, to apply for and obtain a license to operate. Such licensure is, in turn, predicated upon immediate compliance with all of the detailed requirements of the regulation (with the exception of the design and construction standards which must be met within two years), and the passing of a pre-licensure inspection. Thus, all affected abortion providers and their patients will, by the explicit terms of the regulation, be forced to immediately face the burdens and incur the additional costs imposed by the regulation.

41. Furthermore, it is undisputed that the regulation will impose burdens upon women seeking first trimester abortions and that it will increase the cost of a first trimester abortion. Although defendants contest that these burdens are "undue," the overwhelming and credible evidence reveals that the regulation is medically unnecessary and that its costs and other burdens, which the court concludes are indeed undue, are not justified by the stated interest in protecting the health of the women undergoing the procedure. The regulation was admittedly not designed solely to serve this interest, and it unsurprisingly will not do so.

## B. EQUAL PROTECTION

42. The court now turns to plaintiffs' contention that S.C.Code Regs. 61–12 violates the Equal Protection Clause of the United States Constitution.

43. The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). However, the Equal Protection Clause does not prohibit all forms of discrimination among persons. Because "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons," *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), the general rule is that a classification will be upheld "so long as it bears a rational relation to some legitimate end," *id.* If, however, the legislation burdens a fundamental right or targets a suspect class, it will only be upheld if it is narrowly tailored to serve a compelling state interest. *See Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249; *see also Plyler v. Moore,* 100 F.3d 365, 373 (4th Cir.1996).

44. In enacting S.C.Code Ann. § 44–41–75, the South Carolina legislature directed DHEC to promulgate regulations for facilities in which five or more first trimester abortions are performed per month. In

response, DHEC promulgated Regulation 61–12, which imposes upon the selected group stringent and costly requirements for licensure which far exceed the requirements imposed by the State of South Carolina upon other licensed physicians who perform comparable, and in some cases identical, surgical procedures in their offices. In order to obtain and maintain their license, the physicians and clinics subject to the regulation must, among other things, immediately comply with its extensive physical plant, staffing, equipment, and recordkeeping requirements, and acquiesce in DHEC's extensive limitation of their professional discretion. However, licensed physicians who choose to limit their abortion practice to the more occasional case or who choose not to perform abortions, are free to perform the identical or virtually identical procedures in their offices. They need not obtain or pay for any license for their offices or clinics, are subject only to the requirements and standards of the South Carolina Board of Medical Examiners, and may remain comfortable in the knowledge that their patients' medical records and medical care will remain confidential. Nor need they subject their patients, even those obtaining first trimester abortions, to medical testing which they deem unnecessary or which their patients choose to decline.

45. The initial question presented is what level of scrutiny should be applied to the classification at issue. Plaintiffs urge this court to apply strict or heightened scrutiny because the classification penalizes the exercise of a fundamental right or, at a minimum, targets a suspect or quasi-suspect class. Defendants, on the other hand, contend that physicians do not constitute a suspect class for equal protection purposes and do not have a fundamental right to perform abortions. Accordingly, defendants argue that this court should apply the rational basis test.

46. Courts addressing the constitutionality of similar types of health care regulations have reached various conclusions under different tests. The most analogous to this case is *Friendship Med. Ctr., Ltd. v. Chicago Bd. of Health,* 505 F.2d 1141 (7th Cir.1974), cited by plaintiffs in this case. In *Friendship,* the Seventh Circuit invalidated abortion service regulations promulgated by the board of health which sought to regulate such things as the design of the medical facility, the type of medical staff and its training, the maintenance of equipment, supplies, and medications, the content of medical records, and the types of medical tests which must be administered to abortion patients. Applying strict scrutiny, the court invalidated the regulation on both due process and equal protection grounds, because fundamental rights were involved. With regard to the equal protection analysis, the court held as follows:

Given the Supreme Court's acceptance of the medical fact that the mortality rate of women receiving legal abortions is "as low as or lower than the rates for normal childbirth," there would seem to be little justification for more extensive governmental regulations, purportedly based on health considerations, for one procedure than the other.

The Chicago Board of Health's Rules on Abortion Services regulate comprehensively physicians who perform abortions, while at the same time leaving other medical procedures, often much more complex and dangerous in terms of the patient's health, up to the good judgment of the physician.

*Id.* at 1152 (quoting *Roe*, 410 U.S. at 149, 93 S.Ct. 705) (internal citations omitted). Because defendants had offered no sufficiently compelling reason to justify the difference in treatment, the court invalidated the regulations. It had previously noted, however, that "on the record before th[e] court there is no basis for determining whether the regulations are even reasonably related to a valid state concern." *Id.* at 1150.

47. The Sixth Circuit has also been called upon to address such comprehensive health regulations. First, in *Mahoning Women's Ctr. v. Hunter*, 610 F.2d 456 (6th Cir. 1979), *aff'g.* 444 F.Supp. 12 (N.D.Ohio 1977), *vacated on other grounds*, 447 U.S. 918, 100 S.Ct. 3006, 65 L.Ed.2d 1110 (1980), the court affirmed the district court's decision to invalidate, under the strict scrutiny test, a city ordinance imposing costly medical and building code requirements on first trimester abortion clinics, while leaving unregulated the performance of other medical and surgical procedures. The district court had concluded that the ordinance impermissibly regulated only physicians who performed abortions, "while leaving other comparable medical procedures to the discretion of the attending physician." *Mahoning*, 444 F.Supp. at 17. The Sixth Circuit subsequently issued its decision in *Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352 (6th Cir.1984), cited by defendants in this case. *Reizen* involved a Michigan licensing scheme which required *all* freestanding surgical outpatient facilities ("FSOFs") to comply with staffing, structural, equipment, counseling, consent, and record-keeping requirements in order to obtain a license to operate. Because the licensing scheme applied to abortion clinics, albeit not exclusively, four abortion clinics challenged the scheme on equal protec-

tion grounds because it exempted private physicians' offices where abortions were performed. The court affirmed the district court's application of the rational basis test as the appropriate standard of review, because the "differentiation between FSOFs and physicians' private offices did not involve any suspect class nor implicate any fundamental right." *Id.* at 358 (footnote omitted). In particular, the court held that "[n]o suspect classification [was] involved ... since the State ha[d] chosen to regulate all FSOFs, not just abortion clinics," *Reizen*, 743 F.2d at 358, and distinguished its earlier ruling in the *Mahoning* case, *see id.* at 358 n. 4.

48. Finally, in *Women's Health Ctr. of West County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir.1989), the Eighth Circuit upheld an abortion regulation which required emergency back-up care against an equal protection challenge, applying the rational basis test. The court noted that, although the regulation applied *only* to abortion providers, the state already required such back-up care for all patients undergoing any outpatient surgery. Thus, the regulation was a reasonable means of ensuring the health of women seeking abortions and did not impose a special requirement upon abortion providers. *See id.* at 1381.

49. With these precedents in mind, and having reviewed the regulation at issue and the evidence presented, the court concludes that Regulation 61–12 violates the Equal Protection Clause of the United States Constitution.

50. First, it has been established since *Roe* that a woman's decision to terminate her pregnancy prior to viability involves the exercise of a fundamental constitutional right.

*See Roe*, 410 U.S. at 155, 93 S.Ct. 705. Regulation 61–12 applies only to abortion providers and directly impacts the exercise of a fundamental right. Furthermore, South Carolina imposes no similar requirements upon physicians or clinics performing comparable procedures. Thus, the court finds it to be most analogous to the licensing scheme invalidated in *Friendship* and concludes that it must survive strict scrutiny analysis. *See Friendship*, 505 F.2d at 1152.

51. While the health and safety of women seeking abortion services in the state is a compelling state interest, it is no more or less compelling that the state's interest in ensuring the health and safety of all citizens seeking medical care from its licensed physicians. And for all the reasons previously discussed in this order, the court concludes that Regulation 61–12 clearly fails because it is not narrowly tailored to serve this compelling state interest.

52. Nevertheless, even were the court to conclude that Regulation 61–12 neither creates a suspect class nor burdens a fundamental right, the regulation must be invalidated under the more deferential rational basis review because the evidence and proffered justifications reveal that Regulation 61–12 is not rationally related to the stated legitimate purpose.

53. Although the most lenient of the tests which can be applied to a classification, the rational basis test is not a directive to uphold state regulation simply because the state proffers a legitimate or even laudable goal. "[E]ven in the ordinary equal protection case calling for th[is] most deferential of standards," the court must find "the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632, 116 S.Ct. 1620.

The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority.

*Id.* "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [the court] ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633, 116 S.Ct. 1620. Furthermore, even if the disadvantaged group does not rise to the level of a "suspect" class entitled to the application of a strict scrutiny analysis, the court must not be blind to the fact that a law or regulation which disadvantages a politically unpopular group "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634, 116 S.Ct. 1620. " '[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.' " *Id.* at 634, 116 S.Ct. 1620 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)).

54. The court now turns to defendants' proffered justifications for Regulation 61–12. First, defendants contend that the regulation does not violate the Equal Protection Clause because the South Carolina legislature directed DHEC to promulgate a regulation for abortion clinics performing five or more first trimester abortions per month and because, in South Carolina, physicians' offices are otherwise regulated by the State Board of Medical

Examiners and not by DHEC. The court rejects this argument.

55. The manner in which South Carolina chooses to regulate their licensed physicians cannot serve as a justification for treating a select group of physicians and their patients differently or to otherwise contravene equal protection rights. Stated otherwise, the state obviously cannot legitimize an otherwise violative classification simply by assigning regulatory authority over the burdened class to a different state agency.

56. Furthermore, while the legislature directed DHEC to regulate abortion facilities which perform five or more first trimester abortions per month, while leaving other licensed physicians under the exclusive supervision of the Board of Medical Examiners, it is undisputed that DHEC retained the discretion to refrain from treating comparable facilities and procedures differently. For example, DHEC could have treated abortion facilities like other physicians' offices and clinics by promulgating regulations consistent with what is already required in physicians' offices by other laws and accepted standards. As to the physical plant requirements of Regulation 61–12, DHEC could have adopted regulations requiring the facility to meet all applicable building codes. As to staff qualifications and medical records, DHEC could have required the supervising physician to hire staff and maintain medical records that, in his or her professional discretion, would appropriately provide for the needs and rights of the patients. And for assistance in this area, DHEC could have sought input from the Board of Medical Examiners and/or from licensed gynecologists, as well as other physicians, who perform such procedures in an office setting. With

regard to needs unique to the abortion procedure, DHEC could have treated abortion providers differently from other physicians' offices and clinics, but only based upon actual differences between those facilities.

57. Defendants only additional argument is that Regulation 61–12 does not violate the Equal Protection Clause because its provisions are rationally related to the legitimate state interest of protecting the health and welfare of women seeking abortions in the state. Defendants' argument appears to be two-fold. First, defendants contend that abortion providers and the abortion procedure have been traditionally placed in a special classification because the abortion decision implicates constitutional concerns and carries emotional ramifications, which set it apart from similar medical procedures. Second, defendants contend that, because abortions are invasive procedures with potentially serious complications, the state has a legitimate interest in promulgating uniform regulations and minimum standards for their performance within the state. Without such regulation, defendants contend, out-of-state abortion providers will be encouraged to come across the borders of South Carolina and perform large numbers of abortions within the state.

58. The first contention can be summarily rejected. Abortions and abortion providers have unquestionably been afforded special protection under the Constitution. This fact, however, does not allow for more stringent regulation; on the contrary, it supports application of a more stringent constitutional review. And while defendants are correct that the abortion

procedure carries emotional ramifications which sufficiently differentiate it from other procedures to allow for the imposition of some special requirements (such as mandatory counseling), Regulation 61–12 is in no way limited to regulatory requirements which are based upon or designed to address this or any other actual difference.

59. Turning to defendants' second justification, the court concludes that it too must be rejected. The State of South Carolina has a legitimate interest in protecting the health and welfare of women seeking abortions in the state. The State of South Carolina has a legitimate interest in promulgating uniform, minimum standards for the performance of invasive surgical procedures, including first trimester abortions, within the state. And the State of South Carolina could constitutionally require that abortions can only be lawfully performed by physicians licensed by the State Board of Medical Examiners to practice medicine pursuant to such uniform, minimum standards, thereby addressing any concern that unqualified, unlicensed physicians will come within its borders and establish unregulated abortion clinics performing unsafe abortion procedures. Nothing in this order concludes that the state may not do so.

60. Simply stated, the constitutional infirmity is not the regulation's proffered justification of promoting maternal health, which is a legitimate state interest, but the regulation's failure to utilize appropriate standards. The regulation singles out physicians and clinics where abortions are performed regularly, as part of the normal course of business and in relatively large numbers, and imposes upon them requirements which are not imposed upon comparable procedures and not even upon all physicians who perform first trimester abortions. In addition, the regulation's requirements reach far beyond those justified by actual differences in the procedure, or by the medical nature and risks of the procedure. As support for its contention that the regulation reflects the current standard of care, defendants rely upon the testimony of its expert, as well as the testimony of Drs. Campbell and Buffkin who voluntarily comply with a number of its provisions. This court, however, places little weight on the testimony of defendants' expert, whose experience in this area is limited at best, and instead is persuaded by the credible testimony of Drs. Campbell and Buffkin (and the other well-qualified physicians) who testified that Regulation 61–12 will not serve to protect the health and welfare of pregnant women seeking abortions and may, on the contrary, act contrary to that stated goal.

61. Furthermore, defendants have offered no satisfactory explanation as to why the state standards applied to physicians' offices and clinics performing comparable procedures would not suffice to regulate first trimester abortion providers or ensure the health, safety and welfare of patients seeking abortions—much less an acceptable basis for excluding physicians and facilities which perform first trimester abortions on a more infrequent basis. Even more inexplicable is the fact that the regulation would apply to providers of five or more medical abortions per month, a nonsurgical procedure consisting of a simple needle injection after which the patient is free to go home. Instead, the regulation has imposed requirements which far exceed medical necessity for the particular procedure

at issue and in many respects exceed requirements which have previously been imposed upon medical facilities which perform procedures implicating higher risks and potential complications than the relatively safe procedure sought to be regulated here.

62. In summary, Regulation 61–12 singles out all physicians and clinics who perform more than the occasional first trimester abortion and requires of them a license to operate their office or clinic. To obtain the license, the physician and clinics must comply with comprehensive mandates governing the physical layout of the clinic or office, the medical equipment which must be purchased and maintained, the cleaning, maintenance, and operation of the clinic and the requisite equipment, the management and training of the staff, and the type of medical care and tests which must be administered and offered to the patients. The onerous, and largely unnecessary, requirements of this regulation are neither "narrow enough in scope [nor] grounded in a sufficient factual context for [the court] to ascertain that there existed some relation between the classification and the purpose it [is now alleged to] serve[ ]." *Romer*, 517 U.S. at 632–33, 116 S.Ct. 1620.

63. Accordingly, the court concludes that Regulation 61–12 singles out and places additional and onerous burdens upon abortion providers which are neither justified by actual differences nor rationally related to the state's legitimate interest in protecting the health and safety of women seeking first trimester abortions. Rather, "its sheer breadth is so discontinuous with the reasons offered for it that the [regulation] seems inexplicable by anything but animus toward the class that it affects." *Romer*, 517 U.S. at 632, 116 S.Ct. 1620. The

fact that the regulation was directed towards a politically unpopular group in the absence of any existing public health problem only bolsters this conclusion. *See e.g. Romer*, 517 U.S. at 632–33 & 634, 116 S.Ct. 1620.

## C. Severability

64. Finally, the court concludes that the infirm provisions of the regulation cannot be severed. The question of severability is determined under state law. *See Dep't. of Treasury v. Fabe*, 508 U.S. 491, 509, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Under South Carolina law,

[t]he test for severability is whether the constitutional portion of the statute remains complete in itself, wholly independent of that which is rejected, and is of such a character as that it may fairly be presumed that the Legislature would have passed it independent of that which is in conflict with the Constitution.

*Thayer v. South Carolina Tax Comm'n*, 307 S.C. 6, 413 S.E.2d 810, 815 (1992) (internal citation and footnote omitted). If the statutory or regulatory scheme does not contain a specific severability clause, the legislature or agency is presumed to have "intended the act to be effected as an entirety or not at all." *South Carolina Tax Comm'n v. United Oil Marketers, Inc.*, 306 S.C. 384, 412 S.E.2d 402, 405 (1991).

65. As an initial premise, the court notes that Regulation 61–12 does not contain a severability provision, despite the fact that other DHEC regulations have included such provisions. *See e.g.*, S.C.Code Ann. Regs. 61–4, Part 6, § 601 (Controlled Substances regulation); S.C.Code Ann. Regs. 61–21, § T (Sexually Transmitted Diseases regulation); S.C.Code

Ann. Regs. 61–105 § B (Infectious Waste Management regulation). Furthermore, the absence of such a clause is consistent with the scheme of the enabling legislation and the nature of the regulation. It is apparent that the South Carolina legislature intended for DHEC to create a comprehensive licensing scheme for abortion providers, as the legislation sets forth specific areas to be addressed by the regulation as a whole, and the text of the regulation is comprehensive and interdependent, reflecting a similar intent that it stand or fall as a whole.

66. Even if such a severability clause had been included, the court concludes that the regulation's extensive constitutional infirmities would render its enforcement impossible. First, although several of the regulation's specific provisions have been referenced in this order, it is the regulation as a whole that violates the fundamental right. The regulation was simply not, as a whole, designed to further the state's legitimate interest in maternal health, and the result is an over-inclusive, unnecessarily detailed regulatory scheme which unduly limits the discretion of licensed physicians and imposes numerous standards of medical care which are not medically indicated or, at a minimum, not medically indicated in every case. It lacks the requisite focus and restraint, and resembles instead what the testimony of the drafters reveals it to be—a product of numerous other regulations and guidelines pasted together without meaningful oversight by persons knowledgeable in the practice of medicine or the performance of first trimester abortion procedures.

67. Finally, even were the court inclined to place the overall infirmities aside, severability is not possible. The regulation is permeated with provisions which are either not sufficiently supported by the state's interest in maternal health or not designed to further that goal, and any attempt by this court to sever even its most offensive provisions would gut the regulation and leave its remnants substantially incomprehensible. In short, the main provisions of this comprehensive regulation and its purpose are clearly invalid, and this court is " 'unable to untangle the constitutional from the unconstitutional.' " *Ragsdale*, 841 F.2d at 1375 (quoting *Mahoning*, 610 F.2d at 460). Accordingly, the court concludes that the violative portions of the regulation are not severable and that the regulation must be struck in its entirety.[18]

## CONCLUSION

Having reviewed the regulation at issue, and the testimony and evidence regarding its promulgation and its probable effect upon the health of women who seek to obtain a first trimester abortion in the State of South Carolina, the court

---

18. Earlier in this litigation, plaintiffs filed a motion for summary judgment, contending that discrete portions of the regulation were unconstitutionally vague, impermissibly delegated veto power over medical facility licensing to third parties; violated the Establishment Clause, and infringed upon the patients' rights to informational privacy. Plaintiffs did not raise a due process or equal protection challenge on summary judgment, seeking instead to request that the court strike the entire regulation because the provisions challenged on the alternative grounds were not severable. Upon review of this limited challenge, the court concluded that full development of the record was appropriate and that, even assuming that the provisions challenged were violative of the other constitutional standards, the remainder of the regulation would most likely survive a severability analysis. Hence, the motion was denied pending full development of the record at trial.

concludes that S.C.Code Regs. 61–12 is violative of the Due Process and Equal Protection Clauses of the United States Constitution and must be declared invalid.[19]

**THEREFORE, IT IS ORDERED** that Douglas E. Bryant, in his official capacity as Commissioner of the South Carolina Department of Health and Environmental Control, the Governor of the State of South Carolina, in his official capacity, and Charles M. Condon, in his official capacity as Attorney General of the State of South Carolina, and their employees, agents and successors are hereby permanently enjoined from enforcing S.C.Code Regs. 61–12 as presently written.

**IT IS SO ORDERED.**

**19.** Because Regulation 61–12 is violative of the Due Process and Equal Protection Clauses, it is unnecessary to separately consider plaintiffs' arguments that certain portions are unconstitutionally vague, violate the patients' confidentiality rights, and/or violate the Establishment Clause of the United States Constitution.